[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 27, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-14479

_____

D. C. Docket No. 04-00100-CV-KD-M

BENTLEY WEST,
JERRY RAINEY

Plaintiffs-Appellants,

versus

JACK TILLMAN,
MS. STEPHENS,
BRIDGETTE S. GOODE,
TIFFANY DAVIS,
ESTER L. MITCHELL, et al.,

Defendants-Appellees,

LAKETA A. WALLACE,

Defendant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(August 27, 2007)**

Before EDMONDSON, Chief Judge, HULL, Circuit Judge  and FORRESTER,[*] District Judge.

PER CURIAM:

In this civil rights action, Plaintiffs Bentley West and Jerry Rainey (collectively, "Plaintiffs") appeal the district court's grant of summary judgment to Defendants Jack Tillman, Sheriff of Mobile County; James E. Owens, Deputy Warden of Mobile County Metro Jail (the "Jail"); Lt. Esther Mitchell, Supervisor of the Jail's Records Division; Bridgette Goode, Corrections Officer at the Jail; and Tiffany Davis, Linda Whitton, and Laketa Wallace, all Records Specialists at the Jail (collectively, "Defendants").  We have discovered no reversible error; we affirm.

## I.  BACKGROUND

This appeal calls into question the adequacy of the Jail's procedures for processing court orders relating to the Jail's inmates.  The record shows that the Jail receives anywhere from 5,000 to 12,000 different court orders per month, sometimes with a volume of up to 2,000 to 3,000 documents per week.  Sometime

---

[*]Honorable J. Owen Forrester, United States District  Judge for the Northern District of Georgia, sitting by designation.

in 2000, the records department staff at the Jail was downsized from six people to two or three people.[1]  As a result, the records department staff worked overtime; and other Jail employees familiar with the records procedure were called in to assist with the workload.  When Capt. Ronnie Phillips took over as acting warden in 2001, he immediately began making efforts to increase the staffing levels at the Jail, including in the records room.  When a new warden took over in April 2003, the Jail was almost fully staffed at its authorized levels, with six people staffing the records room.[2]

West was incarcerated at the Jail on a charge of marijuana possession on 2 November 2002.  Despite a 4 December court order reducing his bond amount and allowing him to execute a signature bond on his own behalf, West remained in custody until 27 December.  According to standard procedures, when the court sent the order to the Jail, the order should have been entered into the Jail's computer system; and the "jail card" should have been delivered to the docket department to accomplish West's release.  Instead, Defendant Whitton, who

---

[1]The record contains testimony that this change in staffing came in the midst of changes in the administration of the Jail, which included the loss of the warden.  The Jail was then without a warden until February 2001, when Steven Ellisor was hired.  Ellisor left the position within one year; and Capt. Phillips became acting warden until April 2003, sharing responsibility for day-to-day operations of the Jail with Defendant Owens.

[2]The "authorized levels" of staffing at the Jail were set by the Mobile County governing authority according to its funding levels.

received the 4 December order, only partially entered the order[3] and failed to deliver the jail card to docketing.

At different times throughout his detention, West asked Jail officials about his release. For example, West asked Defendant Goode to check on his release on at least two occasions.[4] In response to one request on or before 19 December, Goode called the records department to inquire about West's release. Defendant Davis, a records specialist, requested another copy of the order from the court and entered that order into the system; but again, the jail card did not reach the docket room.[5] On 27 December, in response to another inquiry by West, Goode consulted the system and told West he should have been released on 19 December. West was released on 27 December.

Rainey was incarcerated on 31 October 2002, on robbery charges. The grand jury no-billed him on 27 March 2003, and the court order for his release was

---

[3]Whitton entered the reduction of the bond amount but failed to include that West could sign his own bond.

[4]West claims that he complained about his continued detention to various officers, including Goode, in early December. Goode only recalled West inquiring into his status once, on 27 December. But, the record indicates that Goode asked Davis about West on 19 December. Construed in the light most favorable to West, he inquired into his status with Goode on or before 19 December.

[5]During the investigation into West's prolonged detention, Davis reported that she "sent" the jail card to docketing; that the card did not reach the docketing room is undisputed. Veberly Green, Davis's supervisor at the time, testified that Davis "made a mistake" and "inadvertently" did not take the card to the docketing room, the same mistake made by Whitton.

4

sent to the Jail that day. A records specialist -- "thought" to be Defendant Wallace -- entered the order into the system but failed to deliver the jail card. Although Rainey allegedly asked Jail officials about his release from time to time, he was not released until 24 May 2003.

Plaintiffs filed this joint suit under 42 U.S.C. § 1983 against Sheriff Tillman in his official and individual capacities and against the remaining Defendants in their individual capacities, alleging – among other things[6] – that (1) Goode, Davis, Whitton, and Wallace (the "Nonsupervisory Defendants") were deliberately indifferent to Plaintiffs' Fourteenth Amendment due process rights when they failed to bring about Plaintiffs' release from custody; (2) Lt. Mitchell, Sheriff Tillman, and Deputy Warden Owens (the "Supervisory Defendants") were liable for the violation because they failed to staff adequately, supervise, and train the records staff at the Jail; and (3) Sheriff Tillman's release policies (or lack thereof) were unconstitutional under the Fourteenth Amendment Due Process Clause.

Defendants moved for summary judgment on the basis of qualified immunity. The district court granted the motion, concluding that Plaintiffs failed to present sufficient evidence that Defendants were deliberately indifferent to

---

[6]Plaintiffs also named other Jail personnel as defendants, but the claims against those other defendants are not before us at this time. Plaintiffs did not name Mobile County or its governing authority as a defendant.

5

Plaintiffs' rights.[7]  In the order, the district court noted that a page in one of

Plaintiffs' affidavits was missing from the record.  Plaintiffs moved to alter or to

amend the court's order and requested permission to supplement the record with

the complete affidavit. The district court denied the motion. Plaintiffs now appeal

the district court's grant of summary judgment and the court's denial of Plaintiffs'

motion to alter or amend the judgment.

## II.  STANDARD OF REVIEW

We review <u>de novo</u> the district court's disposition of a summary judgment

motion based on qualified immunity, resolving all issues of material fact in favor

of Plaintiffs and then answering the legal question of whether Defendants are

entitled to qualified immunity under that version of the facts.  <u>Lee v. Ferraro</u>, 284

F.3d 1188, 1190 (11th Cir. 2002).  We review the denial of a motion to amend the

judgment for abuse of discretion.  <u>Armstead v. Coler</u>, 914 F.2d 1464, 1466 (11th

Cir. 1990).

---

[7]The district court also granted summary judgment to Sheriff Tillman on the official capacity claims, in accord with our case law on Eleventh Amendment immunity.  <u>See</u>, <u>e.g.</u>, <u>Lancaster v. Monroe County</u>, 116 F.3d 1419, 1429 (11th Cir. 1997).  To the extent Plaintiffs challenge this ruling on appeal, we conclude no error exists in the district court's determination.

6

## III.  DISCUSSION

Under the doctrine of qualified immunity, government officials performing discretionary functions may not be held individually liable for civil damages so long as their conduct does not violate "'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Lassiter v. Alabama A &M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (quoting Harlow v. Fitzgerald, 102 S. Ct. 2727, 2738 (1982)).  In determining whether Defendants have satisfied this standard, we first address whether, in the light most favorable to Plaintiffs, the record shows that Defendants violated Plaintiffs' federal rights.  See Saucier v. Katz, 121 S. Ct. 2151, 2156 (2001).  If we conclude that such a violation occurred, we must then determine "whether the right was clearly established" at the pertinent time by the pre-existing law.  Id.

Plaintiffs assert that their over-detention resulted in a violation of their Fourteenth Amendment due process right to be free from continued detention after the state should have known that they were entitled to release.  See Cannon v. Macon County, 1 F.3d 1558, 1562-63 (11th Cir. 1993).  To establish such a violation, Plaintiffs must show that Defendants acted with deliberate indifference to Plaintiffs' due process rights.  Id. at 1563.  Human error does not equal

7

deliberate indifference.  Plaintiffs must show that Defendants had "(1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] . . . that risk; (3) by conduct that is more than mere negligence."  Cagle v. Southerland, 334 F.3d 980, 987 (11th Cir. 2003) (internal quotation marks and citation omitted) (alteration in original).  The deliberate indifference standard is "a difficult burden for a plaintiff to meet," Popham v. City of Talladega, 908 F.2d 1561, 1563 (11th Cir. 1990); and we are competent to decide as a matter of law whether Plaintiffs have carried their burden.  See, e.g., Gobert v. Caldwell, 463 F.3d 339, 352 (5th Cir. 2006) (concluding "as a matter of law" that, while "trier of fact might find negligence" based on the evidence, a finding of "deliberate indifference . . . could not be sustained"); Pietrafeso v. Lawrence County, 452 F.3d 978, 983-84 (8th Cir. 2006) (reviewing district court's grant of judgment as a matter of law for defendants and concluding that, at most, plaintiff had presented evidence of negligence, not deliberate indifference); cf. Campbell v. Sikes, 169 F.3d 1353, 1368-69 (11th Cir. 1999) (rejecting expert testimony as valid evidence of defendant's subjective knowledge where record did not otherwise create genuine issue of fact on that element and distinguishing other cases where "the egregious facts and circumstances . . . created the requisite factual issue of deliberate indifference or wanton conduct" (emphasis added)).

## A. Nonsupervisory Defendants

Here, nothing evidences that the Nonsupervisory Defendants were deliberately indifferent to Plaintiffs' right to timely release. For West, the evidence shows – at most – that Defendants Whitton, Davis, and Goode were negligent in failing to carry out their responsibilities. At the time of West's over-detention, Defendant Whitton had been employed at the Jail for only a few weeks. She entered some of the relevant information into the computer system but failed to deliver the jail card to the docketing room. West has pointed to no evidence showing that Whitton subjectively knew that her acts would lead to West's over-detention or that she disregarded any such risk.

And, although Defendant Davis was an experienced records specialist and testified that she understood the risks associated with her duties, nothing evidences that her failure to ensure that West's jail card reached the docket room resulted from anything more than negligence. Davis testified that the West release papers simply "fell between the gaps" because of the volume of work in the records room, and testimony from other Jail staff supports her assertion. That Davis may have been "on notice" of Whitton's earlier mistake does not indicate that Davis deliberately disregarded West's rights by failing to ensure that the jail

card was delivered to the docket room; Plaintiffs have offered no testimony to rebut Defendants' evidence that Davis's mistake was an "oversight" and "human error" caused by the heavy workload – in other words, that Davis was, at most, negligent in carrying out her duties.

As for Defendant Goode, although West contends that he complained to her in writing about his over-detention in early December, he offered no specific details about such communications or copies of the written complaints.[8] Furthermore, the record shows that Goode did investigate West's status on at least two separate occasions and arranged for his immediate release once it became clear that he was due to be released. At most, Goode may be faulted for negligently failing to follow up on West's earlier inquiries; such negligence is insufficient to show a violation of West's due process rights. Cf. Longoria v. Texas, 473 F.3d 586, 594 (5th Cir. 2006) ("[R]esponding to an inmate's complaints by referring the matter for further investigation . . . fulfills an official's protective duties under the Eighth Amendment," which also employs a deliberate indifference standard (internal quotation marks and citation omitted)).

---

[8]The record indicates that a copy of an inmate complaint is filed with the classification department and that a copy is also returned to the inmate.

Rainey's allegations are even weaker, as he alleges that either Defendant Whitton or Defendant Wallace (who did not join the summary judgment motion) failed to deliver his jail card in a timely fashion. He introduced no evidence that Whitton – as opposed to Wallace – was responsible for erroneously handling his release order;[9] thus, the district court properly granted Whitton's motion for summary judgment. See Barbour v. Haley, 471 F.3d 1222, 1225 (11th Cir. 2006) ("At the summary judgment stage, general factual allegations of injury will not suffice; rather, the plaintiff must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." (internal quotation marks and citation omitted)).

## B. Supervisory Defendants

Plaintiffs also allege that the Supervisory Defendants unconstitutionally delayed Plaintiffs' release from the Jail by failing to staff properly, supervise properly, and train properly the Jail records staff. "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the

---

[9]In fact, the only evidence supporting Rainey's allegations was Green's testimony that she "thought" Wallace was responsible for Rainey's over-detention.

11

unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks and citation omitted). Thus, the Supervisory Defendants are liable only if they personally participated in the allegedly unconstitutional conduct or if there is "a causal connection between [their] actions . . . and the alleged constitutional deprivation." Id.

Plaintiffs have not alleged that the Supervisory Defendants were personally involved in their over-detentions. Therefore, to survive Defendants' motion for summary judgment, Plaintiffs must present sufficient evidence of either (1) a "custom or policy [that] result[s] in deliberate indifference to constitutional rights or . . . facts [that] support an inference that the supervisor[s] directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so;" or (2) "a history of widespread abuse [that] put[] the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." Id. (internal quotation marks and citations omitted) (second alteration in original). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks

12

and citation omitted). We agree with the district court that Plaintiffs have failed to meet the "extremely rigorous" standard for supervisory liability. Cottone, 326 F.3d at 1360.

## 1. Failure to Staff

Plaintiffs submitted evidence that the Supervisory Defendants were aware of serious understaffing problems at the Jail. Several Jail employees testified they were dissatisfied with their resulting workload, overtime, and stress level; some of them complained to their supervisors. Testimony exists describing instances of over-detention due to paperwork backlogs, computer system problems, and failure to deliver jail cards.[10] One former Jail official said the Jail received about ten

---

[10]For example, Plaintiffs point to six other instances, occurring after West's over-detention and involving Defendant Whitton, in which inmates were over-detained for one or two days for these reasons. And Plaintiffs alleged a 13-day overstay experienced by an inmate named Samuel Dixon in early 2000 – over two years before the events in this case – who filed a similar suit against Sheriff Tillman in July 2001 and therefore allegedly put the Sheriff on notice of the over-detention problems at the Jail. Plaintiffs also introduced an affidavit written by Rebecca Ludlam, who heads the pertinent Alabama District Court Criminal Division. Ludlam averred that the Jail's record room consistently failed to process court orders, resulting in many inmates being detained beyond their release dates. But because the third page of the affidavit was missing from the record, the district court could not discern the time to which Ludlam was referring and noted that "the evidentiary value of the affidavit [was] limited."

After granting summary judgment to Defendants, Plaintiffs moved to alter or amend the order in part because of the third page of Ludlum's affidavit, which they attached to the motion. Plaintiffs said they mistakenly omitted the third page when they scanned the affidavit into the electronic filing system. Nevertheless, the district court denied the motion, keeping the record "as it was when the

13

complaints per month from inmates' families about prolonged detentions, but nothing indicates why those over-detentions occurred or that the complaints were meritorious. See Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987) ("Brooks never demonstrated that past complaints of police misconduct had any merit. Indeed, the number of complaints bears no relation to their validity."). And although Sheriff Tillman could not state that he was aware of specific instances of over-detention, he did testify that he recognized that there could be problems with over-detention as a result of the "paperwork flow." In addition, both Deputy Warden Owens and Lt. Mitchell testified that they were aware of a handful of incidents of over-detention in the five years before Plaintiffs' over-detentions. Thus, construing the evidence favorably to Plaintiffs, the record shows that (1) the Jail had an understaffing problem that resulted in the prolonged detention of some inmates, and (2) the Supervisory Defendants were aware of the understaffing problem and its potential consequences for the inmates.

---

court issued its ruling on defendants' motion for summary judgment." Plaintiffs argue this decision was an abuse of the court's discretion. We disagree. The missing page of the affidavit contains no information probative of Plaintiffs' claims of liability. Ludlum's statements continue without reference to any dates, except for the last few sentences, which only refer to West's incarceration.

14

But the record also reflects that the Supervisory Defendants did not fail to act correctively to address the problem.[11]  When Sheriff Tillman was elected in 1995, court documents were handled almost exclusively by hand.  Since then, Sheriff Tillman has overseen the installation and upgrade of the computer systems at the Jail.  In response to some of the paperwork problems, he has been actively involved in an initiative to integrate the Jail system with the court's computer system.  Sheriff Tillman also took steps to address the understaffing problem: he asked existing staff to work overtime, he temporarily brought in employees from other departments, and he hired new employees in 2002 and 2003, including Whitton and Wallace.[12]  Thus, the evidence does not show that Sheriff Tillman was deliberately indifferent to the understaffing problem at the Jail.

Deputy Warden Owens oversaw day-to-day operations at the Jail.  Although he contended that he only knew of a handful of prolonged detentions in his

---

[11]Plaintiffs have pointed to no evidence that Lt. Mitchell had staffing responsibilities within the records department at the Jail.  The record does show, however, that Lt. Mitchell was aware of the staffing shortage in the records room and reported it to Deputy Warden Owens.

[12]That the understaffing problem was originally caused by the downsizing of the records department staff  does not – by itself – show deliberate indifference.  The evidence indicates that when the Jail administration later recognized that additional staff was needed, steps were taken to increase the staff levels.  For example, Green testified that "[t]hat office was originally a six-man office and they – for whatever reason . . . – they down-sized that office and realized that didn't work and tried to upscale that office again."  Capt. Phillips also testified that, when he took over as acting warden in 2001, he recognized the need for additional staff and worked with the Sheriff's office to hire approximately 75 new staff members over the next two years.

eighteen years of service, he conceded that, when Plaintiffs were over-detained, the Jail was understaffed and that the records room "never had enough people." He complained of the problems to the personnel director and to Lt. Mitchell. By the end of April 2003, when Owens retired, the records room was fully staffed at its maximum authorization of six people. No evidence suggests that Deputy Warden Owens was deliberately indifferent to the staffing problems or that he failed to take corrective action.

## 2. Failure to Train

Plaintiffs also contend that the lack of formal training led to their over-detention. The record shows that, at the time of Plaintiffs' over-detention, the records department staff participated in no formalized training program and that at least some members of the staff were unaware of certain purported Standard Operating Procedures for their duties. But Plaintiffs have not shown that the on-the-job training the records specialists receive is <u>constitutionally</u> inadequate for their duties; the specialists are responsible for receiving court orders, entering information into the computer system, and pulling jail cards and delivering them to docketing. None of the duties require complex technical knowledge or skills.

16

Evidence that the Jail staff occasionally erred and failed to fulfill their duties as instructed is insufficient to satisfy the high standard for supervisory liability.[13] See Pineda v. City of Houston, 291 F.3d 325, 333 (5th Cir. 2002) ("[P]lainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." (emphasis omitted)). And although the record indicates that the records personnel may have benefited from more training, it mainly contains testimony that the mistakes made by the records room staff were, in context, isolated and caused by overwork, stress, and fatigue – circumstances that arise directly from the understaffing problem and the large volume of orders received every day.[14]

---

[13]That Defendant Whitton was a trainee when she improperly entered the information on West's release does not provide sufficient support for Plaintiffs' lack of training claim. Although Green testified that Whitton did not realize that the order called for West's release, there was no testimony that Whitton had not been told or instructed on how to process West's mittimus order.

[14]Defendant Wallace testified that she "could have used more" training but did not indicate that she had ever communicated her desire for more training to any of her supervisors. She also said that she left her position as a records specialist before her probationary period was over because of the stress associated with the position due to the heavy workload.

Whitton similarly testified that if "more time had been taken and set aside where each individual task had been explained on a daily basis, I think I would have understood things a lot better" and suggested that she may have made fewer mistakes if she had received further training or instruction. She also indicated that different variables could affect the complexity of an individual order. But she also testified that she never asked for more training; that, at first, she "kind of went by what I had been shown"; and that, over time, she learned how to deal with various situations by actually handling different kinds of orders and asking for help when she needed it.

17

Even assuming that the Supervisory Defendants were aware that the lack of sufficient training of the records room staff <u>could</u> result in mistakes, no evidence exists that they were aware of the need for a <u>different kind</u> of training or that the training problem – instead of the staffing problem -- actually led regularly to over-detention of inmates.[15]  <u>See</u> <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1351-52 (11th Cir. 1998) (rejecting plaintiff's theory of supervisory liability for failure to train when no pattern of incidents put City on notice of a need to train, in spite of plaintiff's contention that need for training was "obvious").[16]  In any event, the record does not support Plaintiffs' contention that the Supervisory Defendants ignored a need for further training; it shows that the Supervisory Defendants did

---

[15]Lt. Mitchell testified that, during the time of West's over-detention, she did not notice that any of her staff had difficulties in understanding or carrying out their duties, although she did state that Defendant Whitton was a trainee at the time.

Deputy Warden Owens testified that he was never informed of problems with the on-the-job training in the docket and records departments. Green testified, however, that – at some point – Owens was aware of the staffing and training problems in the records department. Green stated that, due to the repeated turnovers in the records office, she and the other specialists "trained [them]selves" and learned as they went. Although she indicated that she reported to the authorities that "this [wa]s a disaster waiting to happen," she did not testify that inmates were regularly over-detained because the records room staff was inadequately trained. In fact, Green testified that the "real problem" in Plaintiffs' cases was that the records office was "overworked and understaffed."

[16]In <u>Gold</u>, we noted that the Supreme Court has never done more than "<u>hypothesize</u>[]" that some "<u>narrow range of circumstances</u>" might exist in which a failure to train claim could succeed without any evidence of prior incidents because the need for training is "obvious" given the constitutional implications of a recurring situation.  <u>See</u> <u>Gold</u>, 151 F.3d at 1352 (internal quotation marks and citations omitted).  We also recognized that any such "obvious need" claim must be based on a "particular glaring omission in a training regimen" and not merely on "possible imperfections" in a training program. Id. (quotation marks and citations omitted).

18

respond to over-detention mistakes by providing more on-the-job training for the records room staff and by adjusting procedures.[17]  Moreover, given the on-the-job format of the records room training program, the lack of additional training is more properly viewed as a function of the understaffing problem – a circumstance the Supervisory Defendants undertook to correct.  For these reasons, we cannot say sufficient evidence supports the idea that the Supervisory Defendants were deliberately indifferent to Plaintiffs' constitutional rights by failing to establish formal training.

### 3.  Failure to Supervise

Plaintiffs next contend that the Supervisory Defendants were deliberately indifferent for failing to provide adequate supervision to the records room staff. But this contention is not supported by the record.  The record does not show that, before Plaintiffs' over-detentions, the Supervisory Defendants were aware of

---

[17]For example, Lt. Mitchell – who supervised the records division at the Jail during the relevant time – testified that she responded to errors made by her staff with more on-the-job training and counseling.  Lt. Mitchell's testimony is corroborated by that of Defendant Whitton, who testified that, after the West incident, she allegedly made other mistakes that were discovered by supervisors and that she was "written up" for the errors.

Both Defendant Davis and Green testified that, since the West and Rainey incidents, some procedures have been altered to reduce the chance that an error would occur.

regular, as opposed to occasional, instances of inmate over-detention or that the Supervisory Defendants should have recognized that those instances were a result of inadequate supervision.

In any event, the record does not show that the Supervisory Defendants provided inadequate supervision or that the chain of command was "out of touch" with the problems at the Jail. That Sheriff Tillman was unaware of specific problems with the records department or of specific over-detentions does not show that he ignored his supervisory responsibilities; he has over 600 employees and has delegated daily responsibility of the Jail to a warden. And Deputy Warden Owens testified that he was aware of the problems in the records department and discussed those problems with the records supervisors, including Lt. Mitchell.

As for Lt. Mitchell, she testified that, while Defendant Whitton was a trainee, Lt. Mitchell assigned Defendant Davis to supervise Whitton's work. Whitton also testified that, when she first began working there, Lt. Mitchell "would come in pretty regularly and see how everything was going." And once Lt. Mitchell was made aware of mistakes by her staff, she counseled her subordinates on the importance of rechecking their work. The record also shows that record specialists were disciplined for mistakes. Therefore, we say the

evidence is insufficient to support the conclusion that the Supervisory Defendants were deliberately indifferent towards or ignored their supervisory responsibilities.

### 4. Lack of Release Policy

Last, Plaintiffs contend that the lack of a formal release policy and the lack of a system for verifying releases is an unconstitutional "custom or policy" for which Sheriff Tillman should be held liable. Again, the record does not support Plaintiffs' claim. The evidence shows that, at the pertinent time, the Jail did have a written policy covering the basic procedures for intake and release of inmates. The record also contains testimony that it would be difficult to have a standard procedure to "cover all of the issues that might come up because there's a lot of irregularities. . . ." When coupled with the evidence that the Supervisory Defendants were aware of only a few instances of over-detention – which they testified stemmed from "oversights" or "mistakes" by the Jail staff, rather than from a lack of proper procedure – insufficient evidence exists to support Plaintiffs' contention that the Supervisory Defendants were on notice that the Jail's release policy was inadequate.

And, contrary to Plaintiffs' contention, the Jail did have a system for verifying inmate release dates. Deputy Warden Owens, Lt. Mitchell, and Green all testified that, upon request, the corrections officers provided inmates with forms by which the inmate could request information on his court appearance or release date. These requests would then be passed along by the officers to the docket or records departments, where the staff would look into the situation and respond "as soon as possible." This "back-up" procedure precludes a determination that the Supervisory Defendants were deliberately indifferent to Plaintiffs' rights. See Armstrong v. Squadrito, 152 F.3d 564, 579 (7th Cir. 1998) (concluding that a similar "complaint procedure saved the will call system [similar to the "no-bill" system in this case] from being deliberately indifferent"). That the inmate complaint system was imperfect[18] does not alter our conclusion, especially given the evidence that Sheriff Tillman recognized the need for a better system and undertook to integrate the Jail computer system with the area courts in an effort to

_____

[18]Deputy Warden Owens stated that some inmate requests never reach the proper department and that some corrections officers do not follow up on the requests as they should. But although Plaintiffs have claimed that Defendants failed to investigate Plaintiffs' "repeated" claims of over-detention, they have not presented evidence that the corrections officers refused to allow Plaintiffs to submit inmate request forms and that such refusals constituted the "policy" or "custom" of the Jail. Cf. Armstrong, 152 F.3d at 579, 568 (concluding that plaintiff had presented "facts establishing that the Jail had either a policy or custom of refusing to accept complaint forms from detainees requesting information on their will call status" after noting that, "[c]rucially, the guards actually refused to accept [plaintiff's complaint] form").

22

automate the booking and release procedures and reduce the likelihood of human error.

## IV.  CONCLUSION

That Plaintiffs were not released in a timely fashion from the Jail is bad. Mistakes were made.  But no one is entitled to an error-free bureaucracy; and deliberate indifference – the federal constitutional standard -- is a high standard. As a matter of law, the record does not show that Defendants were deliberately indifferent to Plaintiffs' right to be released as ordered; instead, the evidence indicates that the errors that led to Plaintiffs' over-detentions were caused by – at worst – the Nonsupervisory Defendants' unfortunate lapses, which were mainly caused by the cuts in staff and budget for the Jail: a problem which the Supervisory Defendants did not ignore but undertook to address during the pertinent time.

**AFFIRMED.**