[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-11919
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 28, 2011
JOHN LEY
CLERK

D.C. Docket No. 5:08-cv-00351-WTH-GRJ

DAVID I. MACMILLAN,

                                                       Plaintiff - Appellant,

versus

LANE RODDENBERRY, individually, and in his
official capacity as Lake County Deputy Sheriff,
SHANE PITMAN, individually, and in his official capacity
as Lake County Deputy Sheriff, et al.,

                                                       Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 28, 2011)

Before EDMONDSON and MARCUS, Circuit Judges, and LAWSON,* District
Judge.

--------------------

* Honorable Hugh Lawson, United States District Judge for the Middle District of
Georgia, sitting by designation.

PER CURIAM:

In this civil rights case, David I. MacMillan, who suffered a leg injury after he was repeatedly tased[1] by two deputy sheriffs during an arrest arising out of a domestic-violence 911 call, appeals a district court order granting summary judgment on his municipal liability claims of excessive force and deliberate indifference to his serious medical needs. He also appeals the district court's denial of his motion for a new trial on account of alleged evidentiary errors at the trial of his excessive force claims against the two deputy sheriffs sued in their individual capacities. After thorough review, we affirm the judgments of the district court.

I.

The basic facts are these: On the evening of September 1, 2004, Holly Fertell, who was at the time living with MacMillan, called 911 to alert the police that MacMillan was hurting her. Deputy Sheriffs Lane Roddenberry and Shane Pitman were called to the scene. A 911 Computer-Assisted Dispatch Report introduced at trial revealed that Fertell claimed that MacMillan might be armed, and she told the 911 dispatcher that she had to hang up or she "will be dead." (Dkt. 20-6 at 107-108)

---

[1] "Taser" is a trademark used for a high-voltage stun gun. See Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1298 n.1 (11th Cir. 2009). "To tase" a person means to shock him or her with a taser.

2

According to MacMillan's testimony at his civil rights trial, he did not know that Fertell had placed the call, and all that had occurred between them was that Fertell had arrived at the house intoxicated, and he had told her not to drive and took away the car keys. She then left, and as he was preparing to shower, he suddenly saw Deputy Sheriff Roddenberry outside through an open bathroom window. Roddenberry ordered him to freeze and then immediately tased him on his bare chest. MacMillan fell forward in pain; Roddenberry then tased him a second time in the chest. Deputy Sheriff Pitman also tased him. MacMillan collapsed and stumbled into the garage. When the officers found him in the garage, his back was to them, and he was sitting on a bench. The deputies ordered him to put his hands in the air, and he complied, but they tased him still again. Even after he was completely subdued, they jumped on his back and continued tasing him, also injuring his leg at some point. The deputies then forcibly pulled his arms behind his back and continued to tase him even as he was handcuffed, causing severe pain and injury to his shoulder. (Dkt. 76 at 49-62)

Not surprisingly, the defendants' accounts differed sharply. Before Deputy Roddenberry tased MacMillan, he identified himself and ordered MacMillan to show his hands. Instead of complying, MacMillan cursed and approached Deputy Roddenberry in an aggressive manner. MacMillan was unaffected by the first tasing and, notably, failed to comply with the officer's continued orders, so Roddenberry

3

tased him again, still without effect; then Pitman tased him. When they found him in the garage, MacMillan again failed to comply with the command to get on the ground and started approaching the officers, so Roddenberry again tased him; only this time the tase was effective. Roddenberry then performed a "drive stun" -- which involved using the taser without a cartridge -- to MacMillan's bicep while he was being handcuffed because he was resisting. (Dkt. 77 at 122-33)

MacMillan was taken directly to the hospital by the deputies. X-rays were taken. The x-rays did not reveal any fractures. MacMillan was provided a metal knee brace for his left leg and was transported to Lake County Jail and booked on charges of domestic violence, possession of controlled substances, and resisting arrest without violence. While incarcerated, MacMillan complained to jail personnel repeatedly about pain in his left leg and asked to see a doctor and/or have an MRI performed. He fell several times, and he was given crutches, a wheelchair, and pain medication. Three days after his arrest, he was taken to the hospital for additional x-rays and pain medication, but the x-rays (which are only capable of detecting fractures) did not show any problems.

In December 2004, after MacMillan was given a CT scan and saw a physician at the jail (apparently for the first time), the physician ordered an MRI of his left leg.[2] An MRI was performed on January 5, 2005, and it revealed that MacMillan had a partial tear of his left quadricep tendon, which required surgery. He was released on bail and subsequently underwent surgery to repair the tendon.

On December 1, 2005, MacMillan was acquitted of all the criminal charges leveled against him.[3]

MacMillan then brought this lawsuit under 42 U.S.C. § 1983 in the United States District Court for the Middle District of Florida on August 25, 2008. His original complaint alleging excessive force and deliberate indifference was lodged against Lake County Sheriff Gary Borders in his official capacity and against six deputy sheriffs in their individual and official capacities, including Roddenberry, Pitman, a deputy named Greg Bare (about whom MacMillan later voluntarily dismissed all claims), and three unnamed deputies (about whom the district court concluded that MacMillan had abandoned his claims because he made no argument

---

[2] It is unclear how long MacMillan had been incarcerated at this point. Although the period may have been as much as three months after he was arrested and jailed, in his complaint and appellate brief MacMillan says that he had been incarcerated for some 45 days. The district court likewise placed the time at 45 days.

[3] A jury found him not guilty of possession of controlled substances and resisting arrest without violence; the domestic-violence charge against him had already been dropped.

in support of them (Dkt. 50, SJ Order at 1 n.1)). Sheriff Borders and Deputies Roddenberry and Pitman moved for summary judgment, and all parties filed motions in limine prior to the scheduled trial date. MacMillan's motion in limine sought to bar the admissibility of his prior arrests, convictions, and alleged use of steroids. The defendants' motion in limine, in turn, sought to block the admissibility of fifteen citizen complaints against the Lake County Sheriff's Office that MacMillan intended to introduce and to prevent MacMillan from calling doctors as expert witnesses.

After hearing argument on the pending motions, the district court granted summary judgment to the defendants on all official capacity claims, but it denied summary judgment to the two deputy sheriffs on the individual capacity excessive-force claims, setting the remaining claims for trial. The district court also ruled that all but one of the citizen complaints were not relevant, and that the admissibility of everything else, including the one remaining citizen complaint and MacMillan's prior arrests, would be ruled on at trial.

During the jury trial, MacMillan's counsel objected to the defendants' efforts to elicit testimony concerning the defendants' prior knowledge that MacMillan had a propensity to violence. First, Deputy Sheriff Roddenberry was asked, "[b]ased upon your experience with Mr. MacMillan, what did you want to do upon arrival at the house?" (Dkt. 77 at 118) MacMillan's counsel objected, but the district court

6

overruled the objection because "[w]hat he understood or believed as it goes to his state of mind and what he then did or refrained from doing is for the jury's evaluation." (Dkt. 77 at 118)  Roddenberry was then asked, over objection, whether he had "any knowledge or background in connection with the potential for violent action" from MacMillan.  He answered the question affirmatively. (Dkt. 77 at 119) Later that day, Deputy Pitman was asked if he knew MacMillan prior to the incident.  Pitman said that he did.  MacMillan's counsel objected again, and the court again overruled the objection because the question related to Pitman's state of mind. (Dkt. 77 at 196) Pitman was then asked, "[b]ased upon your background and experience with Mr. MacMillan, did you feel that he had a propensity towards violence?"  He, too, answered the question affirmatively. (Dkt. 77 at 198)

MacMillan's counsel again objected, on the grounds that the plaintiff's propensity to violence constituted improper character evidence, and moved for a mistrial. (Dkt. 77 at 199)  The district court denied the motion, explaining:

> It seems to me the issue for the jury to determine is whether under the circumstances as known to or reasonably believed by the defendant, the use of force was reasonable, and anything that he may have had in his mind, even though it was erroneous, it seems to me, is admissible.  And the weight to be given it is for the jury's determination, so I'll overrule that objection.

7

(Dkt. 77 at 199-200) Finally, a third deputy who arrived on the scene testified that Roddenberry and other deputies already on the scene told him "that it was a domestic call, that there was a history of violence." (Dkt. 78 at 28-29) MacMillan's counsel again objected, and again the court overruled the objection because the comment was not offered for the truth of the matter asserted, but only to illuminate the officers' state of mind. (Dkt. 78 at 29) At no point did any deputy testify more specifically about the basis for his knowledge about MacMillan or about any specific prior crimes, wrongs, or acts.

At the conclusion of the trial, the jury rendered a verdict in favor of Roddenberry and Pitman. Ten days after the verdict was handed down, MacMillan filed a motion for a new trial, which the district court denied. This timely appeal ensued.

II.

We review a district court's order granting summary judgment de novo, "applying the same standard that bound the district court and viewing the evidence and all reasonable inferences in the light most favorable to" the non-moving party. Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

moving party bears the initial burden of production. Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007).

We review a district court's evidentiary rulings for abuse of discretion, and we may only overturn such a ruling if the moving party establishes that it resulted in a "substantial prejudicial effect." School Bd. of Collier Cnty. v. K.C., 285 F.3d 977, 980 (11th Cir. 2002) (quotation omitted). "When applying an abuse of discretion standard, we must affirm unless we at least determine that the district court has made a clear error of judgment, or has applied an incorrect legal standard." Id. (quoting Piamba Cortes v. Am. Airlines, Inc., 177 F.3d 1272, 1305 (11th Cir. 1999)) (internal quotation marks omitted). We likewise review the denial of a motion for a new trial for abuse of discretion. Action Marine, Inc. v. Cont'l Carbon Inc., 481 F.3d 1302, 1309 (11th Cir. 2007).

MacMillan first argues that the district court erred in granting summary judgment on his official capacity claims against Sheriff Borders, which are functionally claims against Lake County. See Vineyard v. Cnty. of Murray, 990 F.2d 1207, 1210 n.3 (11th Cir. 1993); Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991). However, as the Supreme Court has held, where there has been a jury verdict finding that the individual defendants (here Deputy Sheriffs Roddenberry and Pitman) did not inflict a constitutional injury (i.e., use of excessive force in violation

9

of the Fourth Amendment), there can be no municipal liability for the nonexistent constitutional violation. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); see also Rooney v. Watson, 101 F.3d 1378, 1381-82 (11th Cir. 1996) ("[O]ur finding that the Rooneys did not suffer any constitutional deprivation makes it unnecessary to consider Volusia County's policy or custom."). Since the jury in this case squarely found that Roddenberry and Pitman did not use excessive force, MacMillan's appeal from the summary judgment order in favor of the Sheriff in his official capacity necessarily must fail, as well.

We are also unpersuaded by MacMillan's evidentiary challenge to the trial judge's rulings on MacMillan's history of violence. The Supreme Court held in Graham v. Connor, 490 U.S. 386 (1989), that "a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." Id. at 388. The objective reasonableness analysis involves a careful evaluation of the facts and circumstances surrounding each case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to flee. Id. at 396. Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

We have also explained that whether the amount of force used by a police officer was proper requires a court to ask "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009) (quoting Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002)). This requires that "in the end we must . . . slosh our way through the factbound morass of 'reasonableness.'" Scott v. Harris, 550 U.S. 372, 383 (2007); see also Penley v. Eslinger, 605 F.3d 843, 852 (11th Cir. 2010).

The testimony alluding to MacMillan's propensity to violence was offered and received by the district court not for the truth of the matter asserted, but only, as the district court ruled, to establish the state of mind of the arresting officers and thereby elucidate the reasonableness of Roddenberry's and Pitman's actions. That the arresting deputies had some reason to believe MacMillan was violent bore directly on their view that MacMillan posed an immediate threat to their safety and to the safety of others and on the reasonableness of their conduct. We can discern no abuse of discretion here. Notably, the deputies' testimony was limited to one comment each, no effort was made to explore the foundations of the comments, and the district court explained to the jury that the purpose of the comments was limited to state of mind.

But even if we were to assume that the district court had committed evidentiary error, MacMillan has failed to establish that it had a substantial prejudicial effect. Other evidence admitted at trial (to which MacMillan did not object) also suggested that MacMillan actually was violent. Thus, for example, the officers testified that they were informed specifically that the 911 caller said MacMillan might have a gun and that the complaining witness said she had to hang up or she "will be dead." Moreover, the 911 Computer-Assisted Dispatch Report, which was admitted into evidence without objection, also related that MacMillan had an "extensive [criminal] history." (Dkt. 77 at 59, 71-72)

III.

We turn finally to MacMillan's claims that Sheriff Borders was deliberately indifferent to MacMillan's serious medical needs and that he failed to train and/or supervise the jail personnel concerning the provision of medical treatment. Although MacMillan says in a wholly conclusory manner that the Sheriff was deliberately indifferent to his serious medical needs (Appellant's Br. at xi, 15, 17, 18, 24), he does not make any argument in support of this claim. He has therefore abandoned the argument on appeal. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or

argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

But even if we were to conclude that MacMillan's brief to this court managed to preserve the claim, we still could not find on this record that the district court erred in granting summary judgment to the Sheriff in his official capacity. To begin, MacMillan does not allege that Sheriff Borders personally participated in MacMillan's incarceration, and there is no vicarious liability under 42 U.S.C. § 1983. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1115-16 (11th Cir. 2005). Thus, to succeed on this claim, MacMillan must establish either that Sheriff Borders was on notice of a history of abuse at Lake County Jail, or that he had established customs or policies that resulted in deliberate indifference to MacMillan's constitutional rights. West v. Tillman, 496 F.3d 1321, 1328-29 (11th Cir. 2007). MacMillan has presented no evidence that Sheriff Borders adopted a custom or policy of denying inmates medical care. As for notice, he has offered only two isolated complaints, only one of which occurred prior to his incarceration. Neither complaint bears any similarity to MacMillan's case. In the first complaint, which took place in 2002, all that is known from this record is that a Lake County Jail inmate's unknown medication for an unknown ailment was reduced under unknown circumstances, and no policy violations were found after subsequent review. (Dkt. 50, SJ Order at 13) As

for the second complaint, which took place in 2008, an inmate complained that the medical staff at Lake County Jail refused to take his complaints of pain seriously; the complaint was investigated and again after review found to be unsubstantiated. (Id.) Again, we repeat that claims founded in negligence or even gross negligence will not be enough to state a claim for deliberate indifference. See, e.g., Youmans v. Gagnon, 626 F.3d 557, 564 (11th Cir. 2010).

Accordingly, we discern no error in the district court's order of final summary judgment or in any of its evidentiary rulings.

**AFFIRMED**.