[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-11422

_____

D.C. Docket No. 1:04-cv-01100-RWS


C ALAN POWELL,
TORY DUNLAP,
LEE ANTONIO SMITH,
DAVID EVANS,
STANLEY CLEMONS, II,
ALLEN MIDDLETON,
ANTHONY WESTBROOK,
BENJAMIN BLAKE,
HARRY WITHERSPOON,
ANTIONNE WOLF,
KRISTOPHER ALAN MATKIN,
Individually, and on behalf of all others similarly situated,

Plaintiffs - Appellants,

versus

SHERIFF, FULTON COUNTY GEORGIA,

Defendant - Appellee,

FULTON COUNTY, STATE OF GEORGIA, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(March 7, 2013)

Before DUBINA, Chief Judge, HULL and ALARCÓN,[*] Circuit Judges.

HULL, Circuit Judge:

In this 42 U.S.C. § 1983 action, the Plaintiffs-Appellants appeal the district

court's: (1) grant of summary judgment in favor of the Defendant-Appellee,

Jacqueline Barrett, in her individual capacity, based on qualified immunity; and (2)

denial of their Federal Rule of Civil Procedure 56(d) motion for, inter alia,

additional discovery.  After review and oral argument, we find no reversible error

in the district court's rulings and affirm the grant of summary judgment in favor of

Defendant-Appellee Barrett.

## I.  PROCEDURAL HISTORY

Plaintiffs-Appellants Tory Dunlap, Lee Antonio Smith, David Evans,

Stanley Clemons, II, Allen Middleton, Benjamin Blake, Harry Witherspoon,

Antoinne Wolf, and Kristopher Alan Matkin ("Plaintiffs") were inmates at the

Fulton County Jail, Atlanta, Georgia (the "Jail") at differing times as to each

_____

[*]Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting
by designation.

plaintiff but all at some time between December 2003 and May 2004 while Defendant then-Sheriff Barrett was in charge of the Jail.[1]  Four of the nine remaining Plaintiffs allege they were subject to an unconstitutional visual strip search pursuant to a written Jail policy requiring such searches.  Eight of the nine remaining Plaintiffs assert they were subject to an alleged practice of over-detention beyond the dates of their release.  Plaintiffs allege the visual strip searches violated their rights under the Fourth Amendment and the over-detention violated their rights under the Due Process Clause of the Fourteenth Amendment.[2]

This Court already has affirmed the district court's grant of Defendant Barrett's motion to dismiss as to other parties who were originally Plaintiffs in this case, but remanded the case to the district court for further factual development as to the Plaintiffs-Appellants here.  See the extensive procedural history in: Powell v. Barrett ("Powell IV"), 307 F. App'x 434 (11th Cir. 2009) (per curiam); Powell v. Barrett ("Powell III"), 541 F.3d 1298 (11th Cir. 2008) (en banc); Powell v. Barrett

---

[1]We note that the district court dismissed named Plaintiff Powell for failure to prosecute. Thus, he is not a party to this appeal.

[2]Plaintiffs originally made the over-detention claims under the Fourth and Eighth Amendments, but these claims are properly analyzed under the Due Process Clause of the Fourteenth Amendment.  See Brendlin v. California, 551 U.S. 249, 254, 127 S. Ct. 2400, 2405 (2007) (Fourth Amendment seizure occurs only when a government official "terminates or restrains" an individual's freedom of movement); McDowell v. Brown, 392 F.3d 1283, 1289–90 n.8 (11th Cir. 2004) (noting the overlap between the Eighth Amendment and Fourteenth Amendment standards for establishing liability under § 1983).  Plaintiffs' own brief focuses on the Fourteenth Amendment.

("Powell II"), 496 F.3d 1288 (11th Cir. 2007), rev'd en banc, 541 F.3d 1298;

Powell v. Barrett ("Powell I"), 246 F. App'x 615 (11th Cir. 2007) (per curiam).

Discovery occurred between July 14, 2009 and June 24, 2010.  Defendant

Barrett filed the instant motion for summary judgment as to these remaining

Plaintiffs' claims on November 2, 2010.  On March 3, 2011, the district court

granted Defendant Barrett's motion for summary judgment as to the strip search

claims.  On February 17, 2012, the district court granted Defendant Barrett's

motion for summary judgment as to the over-detention claims.  Plaintiffs timely

appealed both summary judgment rulings.[3]

## II.  STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment on

qualified immunity grounds.  West v. Tillman, 496 F.3d 1321, 1326 (11th Cir.

2007).  We resolve all material factual issues in favor of the non-moving party,

Plaintiffs, and then answer the legal question of whether the moving party, Barrett,

is entitled to qualified immunity.  See id.

---

[3]Plaintiffs also appeal the district court's denial of their Rule 56(d) motion.  We review for abuse of discretion the district court's denial of a Rule 56(d) motion, and we will not overturn the district court unless the moving parties, Plaintiffs, demonstrate that the district court's ruling resulted in substantial harm to their case.  Harbert Int'l v. James, 157 F.3d 1271, 1277 (11th Cir. 1998).  After review of the Rule 56(d) issues, we conclude Plaintiffs have not shown the district court abused its discretion.

To the extent Plaintiffs-Appellants appeal other interim rulings by the district court before the two final summary judgment rulings, we conclude they have not shown any reversible error as to them either.

## III.  DISCUSSION

### A.  Qualified Immunity

"Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right."  Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008).  To receive qualified immunity, a government official must first establish that she acted within her discretionary authority.  Lewis v. City of W. Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009).  There is no dispute that Barrett was acting within her discretionary authority at all relevant times.

"Once discretionary authority is established, the burden then shifts to the plaintiff[s] to show that qualified immunity should not apply."  Id.  To overcome qualified immunity, Plaintiffs must show that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).  We may consider these questions in any order.  See Ashcroft v. al-Kidd, 563 U.S. —, 131 S. Ct. 2074, 2080 (2011).

### B.  The Over-Detention Claims

As for the over-detention claims, the Due Process Clause of the Fourteenth Amendment guarantees to individuals the right to be free from excessive continued

5

detention after a jail or prison ceases to have a legal right to detain the individual. See Cannon v. Macon Cnty., 1 F.3d 1558, 1562–63 (11th Cir. 1993) (holding that the Fourteenth Amendment guarantees the "right to be free from continued detention after it was or should have been known that the detainee was entitled to release"); Douthit v. Jones, 619 F.2d 527, 532 (5th Cir. 1980).[4]

A Fourteenth Amendment claim based on over-detention "must meet the elements of common law false imprisonment and establish that the imprisonment worked a violation of [F]ourteenth [A]mendment due process rights." Cannon, 1 F.3d at 1562–63 (footnote omitted). "The elements of common law false imprisonment are an intent to confine, an act resulting in confinement, and the victim's awareness of confinement." Campbell v. Johnson, 586 F.3d 835, 840 (11th Cir. 2009). "To establish a due process violation, [Plaintiffs] must prove that [Barrett] acted with deliberate indifference." Id.

Deliberate indifference exists when a government official "(1) had subjective knowledge of a risk of serious harm; and (2) disregarded that risk; (3) by conduct that is more than mere negligence." West v. Tillman, 496 F.3d 1321, 1327 (11th Cir. 2007) (internal quotation marks and alterations omitted). "[D]eliberate indifference requires that the indifference be a deliberate choice, which is an exacting standard." Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d

---

[4]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

6

334, 344 (11th Cir. 2012) (internal citations and quotation marks omitted).  There is no evidence Barrett personally participated in the releases of the Plaintiff inmates here.  Thus, Plaintiffs' claims against Barrett are based on supervisory liability.

Specifically, Plaintiffs contend the Jail employees working for Barrett violated their Fourteenth Amendment rights and Barrett, as their supervisor, is liable for those officials' wrongful conduct.  A supervisory official is only liable under § 1983 "for the unconstitutional acts of [her] subordinates . . . . if there is a causal connection between [her] actions and the alleged constitutional deprivation."  West, 496 F.3d at 1328 (original alterations and internal quotation marks omitted).  The necessary causal connection exists when: (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation <u>and he fails to do so</u>"; (2) "a supervisor's custom or policy results in deliberate indifference to constitutional rights"; (3) "facts support an inference that the supervisor directed the subordinates to act unlawfully"; or (4) facts support an inference that the supervisor "knew that the subordinates would act unlawfully and failed to stop them from doing so."  Cottone v. Jenne, 326 F.3d 1352, 1360–61 (11th Cir. 2003) (internal quotation marks and citations and original alterations omitted) (emphasis added).  The standard for supervisory liability is "extremely rigorous."  Id. (internal quotation marks omitted).

7

Assuming without deciding that, when they were over-detained, Plaintiffs' Fourteenth Amendment rights were violated by the Jail employees, Plaintiffs have not established that Barrett is liable as a supervisor.

As for the first possible method for establishing the necessary causal connection, notice and failure to take corrective action, Barrett concedes that she was on notice of a widespread over-detention problem during the relevant period. The over-detentions were not created by Barrett but by: (1) a shortage of staff; (2) a sharp increase in the average daily Jail population owing to an influx of Atlanta Police Department arrestees; and (3) inefficient filing and communication systems of the courts. Nevertheless, the record shows that Barrett took significant corrective actions.

For example, Barrett attempted to increase the number of Jail staff processing release orders by: (1) requesting additional funds from Fulton County; (2) seeking authorization to allow civilian employees to process release orders; and (3) by requiring all department employees to work shifts at the Jail. Additionally, Barrett reformed the Jail's methods of processing release orders by: (1) posting a board in the release order processing office that displayed the number of release-eligible inmates awaiting release; (2) requiring bonding companies to arrive at specific times each day; and (3) implementing a new filing system that required records to be kept in a filing cabinet instead of in milk crates. Barrett also

8

attempted to improve communication between the courts and the Jail by: (1) asking judges to use a standardized release order form; (2) asking judges to send all release orders to a single fax machine located at the Jail; and (3) assigning a deputy to work as a liaison between the Jail and the courts.  Barrett did these things after hiring a new Chief Jailer and tasking him with studying and improving the Jail's release operations.

Barrett's corrective measures were very similar to corrective measures that this Court previously considered in another case involving over-detention claims. West, 496 F.3d at 1325–26.  As is the case here, in West, the jail supervisors admitted that they were aware of an over-detention problem.  Id. at 1329.  Because, however, the supervisory defendants acted to correct the over-detention problem, we held that they were not subject to supervisory liability under the first method described in Cottone.  Id. at 1330.  For example, the supervisory defendants in West: (1) attempted to improve channels of communication between the courthouse and the jail; (2) requested that employees work overtime; (3) shifted employees from other departments to the jail's release processing units; (4) installed new computer systems at the jail; and (5) hired new employees.  Id.   Like in West, Barrett's corrective measures were sufficient to rebut any showing of a causal connection between Barrett's actions and any constitutional deprivations

9

that Plaintiffs suffered.[5]

As for the second possible method, deliberate indifference, Plaintiffs must show that Barrett's chosen custom or policy resulted in deliberate indifference to constitutional rights. See Cottone, 326 F.3d at 1358. This they did not do. There is no evidence that any custom or policy adopted by Barrett created the Jail's over-detention problem. Instead, as discussed above, various factors outside of Barrett's control created the problem, including: (1) a 29% increase in the Jail's inmate population caused by the Atlanta Police Department's decision to send all arrestees suspected of committing state offenses to the Jail instead of to City detention facilities; (2) understaffing in departments responsible for processing release orders; (3) delays in transmitting release orders from the Fulton County Courthouse to the Jail; (4) Jail officials' difficulties in interpreting release orders; (5) twice-weekly maintenance-related shutdowns of the Jail's computer system; and (6) the Jail, the district attorney, and the court system each using different computer systems.

As to the third and fourth methods, there is no evidence that Barrett directed any subordinates to act unlawfully and no evidence sufficient to support an inference that she knew subordinates would act unlawfully. The district court did

---

[5]To the extent that Plaintiffs contend that Barrett is liable for a failure to train or a failure to supervise, there is no evidence in the record suggesting that Jail officials did not receive adequate training or supervision in processing release orders.

10

not err in concluding that Plaintiffs failed to show a constitutional violation by Defendant Barrett personally or as a supervisor and in granting summary judgment to Defendant Barrett on Plaintiffs' over-detention claims based on qualified immunity.

## C. The Strip Search Claims

In Powell III, this Court, en banc, (1) assumed that the Fourth Amendment protects pre-trial detainees from unreasonable searches, and (2) concluded it does not violate the Fourth Amendment for a pre-trial detention facility to maintain a policy "requir[ing] that searches be conducted on every inmate after each contact visit [with someone from outside of the facility], even without the slightest cause to suspect that the inmate [is] concealing contraband." 541 F.3d at 1306; see id. at 1305–14. We held that visual strip searches of detainees—without reasonable suspicion and prior to the detainees' entering the general jail population—are constitutional. Id. at 1314.

Later, the Supreme Court reached the same conclusion in Florence v. Board of Chosen Freeholders of the County of Burlington, 566 U.S. —, 132 S. Ct. 1510 (2012), a case involving similar facts. It concluded that "[c]orrectional officials have a significant interest in conducting a thorough search as a standard part of the intake process." 566 U.S. at —, 132 S. Ct. at 1518.

There are only two types of strip search claims still remaining in the case but

11

they both involve strip searches in connection with entry or reentry into the Jail's general population, and thus those claims fail to show a Fourth Amendment violation.

As to the first type, Plaintiffs Powell and Matkin[6] entered the Jail upon arrest and were held in the intake area prior to their first appearance hearings conducted inside the Jail. At their hearings they were granted bond or ordered released. These inmates were not strip searched prior to their hearings. Rather, after their hearings, they were placed in the general Jail population and strip searched then. While the Plaintiffs waited in the general Jail population, the Jail staff completed the late or delayed booking process and then, as part of the release process, searched for other detention holds, warrants, or other holds.

As to the second type, Plaintiffs Evans and Wolfe were transported to state court at the Fulton County Courthouse for a hearing or other proceeding, then ordered released by a judge, and then returned to the Jail where they were strip searched before reentering the general Jail population. They were returned to their prior assigned housing units in the general Jail population to retrieve any personal belongings. The Plaintiffs had gone outside the Jail, where they potentially came into contact with providers of contraband or with possible items not allowed in the

---

[6]Defendant Barrett argues that Plaintiffs made an over-detention claim for named Plaintiff Matkin but not a strip search claim for him. We need not resolve that issue because Matkin's strip search claim fails in any event.

12

Jail. [7]

In both types of claims above, the strip searches were done before, and because, the inmates were being placed into, or back into, the general Jail population. The strip searches were not part of the release process.

Further, Plaintiffs do not dispute they entered or reentered the general Jail population after these strip searches. Rather, what Plaintiffs are in effect saying is that they should not have been taken back into the general Jail population but they should have been segregated in a separate holding area in the Jail while all of the release process procedures took place, such as waiting for the court paperwork to be sent to the Jail, the Jail employees' then checking for warrants and holds, and having any personal items located and returned. Plaintiffs' challenge is really to the decision to place them in the general Jail population. However, there is no constitutional right, much less a clearly established one, to be held in a particular cell or a separate area of a Jail and not be placed back in the general Jail population. [8] Further, to the extent Plaintiffs are arguing that they were placed in the general Jail population and held too long, the district court correctly concluded

---

[7]Defendant Barrett articulated at least legitimate reasons for returning inmates to their assigned housing units in the general Jail population.

[8]We also question whether Plaintiffs have shown that this overcrowded Jail even had adequate, separate facilities wholly apart from the general Jail population to house inmates who may be released. We need not however resolve this separate-housing issue because there was no clearly established constitutional right to separate housing shown here.

that was an over-detention issue not a strip search issue.[9]

At the end of the day, each Plaintiff here—whether after a first appearance hearing at the Jail or after court returns—was actually placed in the general Jail population and the challenged strip searches occurred due to their entering for the first time or reentering the general Jail population; thus, we conclude Plaintiffs have not shown a violation of their constitutional rights under the Fourth Amendment.  Under both Florence and Powell III, jailers do not violate detainees' Fourth Amendment rights by visually searching them for legitimate safety and penological reasons prior to admitting or readmitting them to the Jail's general population.

## IV.  CONCLUSION

Defendant Barrett was entitled to qualified immunity as to Plaintiffs' over-detention and strip search claims.  Thus, the district court properly granted Barrett's motions for summary judgment.

In light of the foregoing, we affirm.

**AFFIRMED.**

---

[9]For example, Matkin entered the Jail on March 18, and was ordered released on March 19 but was not released until March 23.  While Matkin was held in the intake holding cell originally, his strip searched occurred right before he went to the general Jail population and he testified he remained in the general Jail population for one day.