[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14804

_____

D.C. Docket No. 6:15-cv-00094-JRH-GRS

JUDITH ALCOCER[1],

Plaintiff-Appellee,

versus

ASHLEY MILLS,
JOHN STATEN,

Defendants- Appellants.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(October 9, 2018)

Before JORDAN, ROSENBAUM, and DUBINA, Circuit Judges.

ROSENBAUM, Circuit Judge:

---

[1] After filing this lawsuit, Plaintiff-Appellee Judith Alcocer changed her name to Judith Hinojosa-Diaz.  For purposes of clarity, we continue to refer to Plaintiff-Appellee in this opinion as Alcocer.

Much has been said about the art of diagnosis.  For example, Mahatma Gandhi[2] opined, "A correct diagnosis is three-fourths the remedy."  Prashant Gupta, *Wisdom of Gandhi* 53 (2008).

After all, a misdiagnosis can prevent a solution from ever being found. Take, for instance, the case of President James A. Garfield.  After an assassin wounded President Garfield, the President's physician became convinced that the bullet was lodged near the liver, and he performed several unsuccessful operations to remove it.  CBS News, *How Doctors Killed President Garfield*, July 5, 2012, https://www.cbsnews.com/news/how-doctors-killed-president-garfield/ (last visited Oct. 9, 2018).  But, in fact, the bullet was on the other side of President Garfield's body.  *Id.*  And the unsuccessful operations—not the bullet—caused infection and ultimately felled President Garfield.  *Id.*

Not surprisingly, diagnosing the problem correctly is also crucial to resolving 42 U.S.C. § 1983 claims of constitutional-rights violations:  the first step in any § 1983 analysis requires identification of the precise right that is alleged to

---

[2] Among many things for which he is remembered, Mahatma Gandhi, who formally studied the law, advocated for the civil rights of Indians and was the leader of India's non-violent movement for independence from British rule. https://www.biography.com/people/mahatma-gandhi-9305898 (last visited Oct. 9, 2018).  His ways inspired many others, including Martin Luther King, Jr., *see* https://kinginstitute.stanford.edu/encyclopedia/gandhi-mohandas-k (last visited Oct. 9, 2018), Nelson Mandela, *see* https://economictimes.indiatimes.com/news/politics-and-nation/nelson-mandela-the-gandhi-of-south-africa-had-strong-indian-connections/articleshow/26969042.cms (last visited Oct. 9, 2018), and Albert Einstein, *see* http://www.openculture.com/2013/01/albert_einstein_expresses_his_admiration_for_mahatma_gandhi.html (last visited Oct. 9, 2018).

2

have been violated.    Different rights prescribe different legal analyses, so accurately diagnosing the right at issue is critical to properly analyzing a § 1983 plaintiff's claims.  And correctly diagnosing the precise right involved, in turn, demands careful consideration of the alleged facts.

Here, Plaintiff-Appellee Judith Alcocer was arrested and detained for the misdemeanor offense of driving with a suspended license.  After Alcocer satisfied the bond requirements, the Bulloch County jail continued to detain her because jail officers became suspicious that she might be present illegally in the United States. She wasn't.  But that was not resolved to the jail's satisfaction until after Alcocer had already spent the night there.

Alcocer sued Defendants-Appellants Ashley Mills and John Staten,[3] employees of the Bulloch County jail, for violating her constitutional rights. Defendants moved for summary judgment, invoking qualified immunity, and the district court denied the motion.

On appeal, we must consider whether the district court correctly identified the Fourth Amendment right to be free from unreasonable seizures as the right allegedly violated, or whether instead, as Defendants assert, the facts here concern the alleged violation of Alcocer's Fourteenth Amendment right to be free from continued detention after law enforcement should have known that she was entitled

---

[3] Alcocer also sued others, but the district court granted summary judgment in their favor. Because Alcocer did not appeal those rulings, we do not discuss these other defendants here.

to release.  The right involved makes a significant difference.  If the facts implicate Alcocer's Fourth Amendment right, to receive qualified immunity, Defendants must have had probable cause, or at least arguable probable cause, to believe Alcocer was illegally in the United States.  If, on the other hand, the Fourteenth Amendment governs the fact pattern here, Alcocer must show that Defendants were deliberately indifferent to her right to be released.  We conclude the district court did not err in determining that the Fourth Amendment governs the analysis here.

But while the district court accurately identified the precise right involved, it did not conduct an individualized analysis of each Defendant's actions and omissions and whether they were causally related to the alleged violation of Alcocer's Fourth Amendment rights.  So we must reverse the denial of summary judgment.  We remand to the district court to, in the first instance, conduct an individualized analysis of each Defendant's actions and omissions to determine whether either or both Defendants can be held liable for the deprivation Alcocer experienced.

**I.**[4]

---

[4] Since we are reviewing an order on a motion for summary judgment, we must consider the evidence in the light most favorable to the non-moving party—in this case, Plaintiff-Appellee Judith Alcocer—and resolve all material disputes of fact in her favor.  *Stephens v. DeGiovanni*, 852 F.3d 1298, 1315 (11th Cir. 2017) (citation omitted).  We recognize, however, that "the facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the

At around 1:30 p.m. on Thursday, January 30, 2014, Bulloch County Sheriff's Office deputies arrested Alcocer for the misdemeanor offense of driving with a suspended license. After arresting Alcocer, deputies took her to the Bulloch County jail, where they transferred her to the custody of the jail staff.

At the jail, at roughly 3:30 p.m., Mills, then a jailer with the Bulloch County Sheriff's Office, booked Alcocer. As part of the process, Mills asked Alcocer for, among other information, her address and her Social Security number, to input into the Sheriff's Office's computer system. She also noted in the system Alcocer's Georgia driver's license number.

When Mills finished reporting Alcocer's demographic information, Alcocer was fingerprinted. According to Alcocer, the same woman who booked her— Mills—also took her fingerprints.[5]

At some point in this process, Alcocer's information was run through computerized databases, including those of the National Crime Information Center ("NCIC"), the Georgia Crime Information Center ("GCIC"), and the Automated Fingerprint Identification System ("AFIS"). Mills testified that it was the fingerprinting jailer's responsibility to perform this task.

---

case." *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000) (internal quotation marks omitted).

[5] Mills denied having fingerprinted Alcocer, though she did state that she has fingerprinted others in the past.

5

After the Sheriff's Office submitted Alcocer's information to the databases, it received a fax from the Immigration and Customs Enforcement ("ICE") office located in Savannah. The fax stated with respect to Alcocer, "[ICE] RECORDS INDICATE THAT THIS SUBJECT IS NOT LEGALLY IN THE UNITED STATES AND APPEARS TO BE SUBJECT TO REMOVAL PROCEEDINGS." But significantly, the document cautioned, "THIS IS NOT A GOVERNMENT DETAINER! THE INFORMATION IS FOR LAW ENFORCEMENT USE AND IS BEING PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THIS RESPONSE IS NOT SUPPORTED BY FINGERPRINTS."

Apparently based on this fax, after Alcocer was processed into the jail, and before Mills finished her shift at 7:00 p.m. that night, Mills's supervisor, Sergeant Kirkland, directed Mills to add a note to Alcocer's information contained in the Sheriff's Office's computer system: "CONTACT ICE IN ATLANTA GA FOR PICK UP BEFORE RELEASING."

While these events were occurring, Alcocer's sister, Susana Hinojosa, was hard at work trying to get Alcocer released from the jail. Alcocer had called to advise Hinojosa that she had been arrested. So Hinojosa went to the jail to see about getting Alcocer out.

At some point in the afternoon of January 30, the Sheriff's Office staff informed Hinojosa that Alcocer had to satisfy a $2,000 bail requirement to obtain

6

release. So Hinojosa went across the street to a bail bondsman and arranged for bail for Alcocer. Then Hinojosa returned to the jail to wait for Alcocer's release.

Sometime between 5:00 and 6:00 p.m., the Sheriff's Office staff informed Hinojosa that it would not release Alcocer, despite Hinojosa's payment of the bail, because ICE had a hold on Alcocer. When Hinojosa asked the reason for the ICE hold, the Sheriff's Office staff said that Alcocer was "illegal or they're trying to deport her or something showed up on her record."

Hinojosa responded that Alcocer was "not illegal[;] she's a U.S. citizen, . . . born in South Carolina." And Hinojosa asked what she needed to bring to the jail to prove that fact. The Sheriff's Office staff ignored her. So she left to gather paperwork to show that Alcocer was a United States citizen.

Sometime the next day (Friday, January 31, 2014), Sheriff's Office staff added notes to the information on Alcocer previously entered into its system. The first note stated, "PER CAPTAIN STATEN, IF I.C.E. DOES NOT SEND A HOLD ON [Alcocer] BY [Monday,] 02/03/2014, SUBJECT CAN POST BOND. BOND IS IN FILE." The second, entered by a different staff member, repeated the same sentiment: "PER CAPTAIN STATEN IF WE DO NOT HEAR ANYTHING FROM ICE BY MONDAY, THEN [Alcocer] CAN POST BOND ON MONDAY." Captain John Staten, referenced in these notes, was the highest ranking officer at the jail.

7

Meanwhile, Hinojosa had begun calling the jail at 8:00 a.m. on January 31 to find out whether ICE had released its purported hold on Alcocer. The Sheriff's Office staff said it had not. Hinojosa responded that the Sheriff's Office was "holding [Alcocer] for no reason" and asked the Sheriff's Office for a number for ICE so she could resolve the problem herself. The staff member insisted the Sheriff's Office did not have a number for ICE.

So every fifteen minutes, Hinojosa called the Sheriff's Office to ask whether ICE had gotten back to the Office, all to no avail. Finally, at 11:00 a.m., a different person at the Sheriff's Office answered the phone. Once again, Hinojosa asked whether Alcocer had been cleared to leave the jail. When the staff member said she had not, Hinojosa asked whether he could call ICE to find out what the problem was. Though the staff member declined to do so, he gave Hinojosa a number for ICE in Savannah and suggested that she call the agency instead.

That's exactly what Hinojosa then did. Eventually, Hinojosa was able to speak with ICE employee Robert T. Franks. Hinojosa explained that the Bulloch County Sheriff's Office was refusing to release her sister because of an alleged ICE hold, and that a mistake must have occurred because her sister was a United States citizen. Franks responded that he would call the Sheriff's Office and have the order on which they were basing the hold faxed to him, and then he would send

8

the Sheriff's Office an order releasing Alcocer.  He also instructed Hinojosa to take to the jail all of her paperwork showing that Alcocer was a United States citizen.

Based on Franks's advice, sometime between noon and 1:00 p.m., on January 31, Hinojosa returned to the jail with Alcocer's documentation.  That consisted of Alcocer's birth certificate, her Social Security card, her medical records, and her papers from the school board.  But the Sheriff's Office staff refused to look at it, instead insisting that ICE had a hold on Alcocer.

Later that day, Franks called Hinojosa to let her know that the Sheriff's Office could not find the paperwork putting Alcocer on an ICE hold.  He also told Hinojosa that he would fax the Sheriff's Office an order to release Alcocer.

Sure enough, Franks faxed the Sheriff's Office a document entitled, "IMMIGRATION DETAINER-NOTICE OF ACTION."  The notice reflected that Alcocer was a United States citizen and instructed, "Cancel the detainer previously placed by this Office on 1-31-2014."  About ten or fifteen minutes after Franks's call to Hinojosa, at 5:44 p.m., the Sheriff's Office released Alcocer.  All told, Alcocer was detained for a total of roughly 26 hours.

Based on these events, Alcocer filed suit under 42 U.S.C. § 1983 against Mills and Staten.  She alleged, as relevant here, that they violated her Fourth Amendment right to be free from unreasonable seizure when they would not release her after her bond was arranged.  She further claimed that Staten was

9

subject to supervisory liability for the allegedly unconstitutional actions of his subordinates.

Mills and Staten moved for summary judgment, denying that they had violated Alcocer's Fourth Amendment rights and asserting qualified immunity. Staten also argued for summary judgment on the basis that he was not subject to supervisory liability. The district court denied Mills and Staten's motion.[6] They now appeal.

## II.

We review de novo the district court's order denying summary judgment and concluding Mills and Staten are not entitled to qualified immunity. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). In doing so, we resolve all issues of material fact in favor of the plaintiff, viewing the alleged facts in the light most favorable to the plaintiff. *Id*. Then we determine whether, based on this version of the facts, Defendants are entitled to qualified immunity. *Id.*

## III.

Qualified immunity protects government employees from suit in their individual capacities for discretionary actions in which they engage in the course of their duties. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v.*

---

[6] The district court did grant Mills and Staten's motion for summary judgment to the extent that it sought summary judgment on other claims Alcocer had raised against them. Because Alcocer does not appeal that aspect of the order, we do not discuss those claims here.

*Fitzgerald*, 457 U.S. 800, 818 (1982).  It allows "government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." *Durruthy v. Pastor*, 351 F.3d 1080, 1087 (11th Cir. 2003) (citation omitted).  Under qualified immunity, "all but the plainly incompetent or one who is knowingly violating the federal law" are shielded from litigation.  *Ferraro*, 284 F.3d at 1194 (citation omitted).  Yet qualified immunity "does not offer protection if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]."  *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003) (quoting *Harlow*, 457 U.S. at 815 (internal quotation marks omitted) (alteration provided by *Holmes*)).

An official who asserts entitlement to qualified immunity must first establish that she or he was acting within the scope of his discretionary authority.  Once the official makes that showing, the burden shifts to the plaintiff to demonstrate that qualified immunity is inappropriate.  *Ferraro*, 284 F.3d at 1194.  Overcoming the official's qualified-immunity defense requires a plaintiff to establish both that the officer's conduct violated a constitutionally protected right and that the right was clearly established at the time of the misconduct.  *Pearson*, 555 U.S. at 232; *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010).  We may consider in any order whether the plaintiff has satisfied her burden.  *Pearson*, 555 U.S. at 236.

11

Because § 1983 "requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation," *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citation omitted), each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions.  So we must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged.

That did not sufficiently occur here.  Though the district court denied Mills qualified immunity, it did not individually analyze her alleged actions before doing so.  Rather, it explained its denial of qualified immunity as follows:

> Defendants detained [Alcocer], a United States citizen, for 25 hours based upon a fax from I.C.E. stating, without any supporting evidence, that [Alcocer] appeared to be subject to removal.  Furthermore, they detained her in spite of the fact that she had in her possession a valid Georgia driver's license—a form of identification which is not knowingly given to persons unlawfully present in the United States—and in spite of the fact that her sister procured and proffered a copy of her birth certificate, social security card, and school records.  No reasonable officer in the same circumstances could have believed probable cause existed to detain [Alcocer] for being in the country illegally.

This description of events does not parse the actions Mill undertook and omitted, on the one hand, and the actions others engaged in without Mills's knowledge or participation.  For example, it states that Alcocer was detained based on the ICE

12

fax that expressly stated it was not a detainer. But the analysis does not consider whether Mills, in fact, saw the ICE fax, whether she nonetheless had a responsibility to actually review the ICE fax, or whether she had no such duty and was misinformed of the fax's contents by another. The analysis also mentions that Hinojosa provided Alcocer's birth certificate, Social Security card, and school records. But that happened on January 31. And Mills was not at work that day, since her shift ended at 7:00 p.m. on January 30. So those particular events cannot be considered in determining whether Mills is entitled to qualified immunity.

As for Staten, the district court order similarly does not sufficiently address the evidence as it pertains solely to him. True, pointing to the two January 31, 2014, notes entered into the Sheriff's Office's computer system at Staten's direction, the order adds that Staten "was personally involved in detaining [Alcocer]." But the district court did not consider what Staten knew or should have known at the time that he instructed Office staff to continue to hold Alcocer. For example, was Staten physically present at the Sheriff's Office so he could review the alleged detainer? Or was he out of the Office on January 30 and 31, so he relied on another's description of the ICE fax as a detainer? And if he accepted another employee's characterization of the ICE fax as a detainer, was it reasonable for him to do so?

13

Because the district court's order did not individually evaluate each defendant's specific actions and omissions, we reverse the denial of summary judgment and remand the matter to the district court for further proceedings. On remand, the district court shall, in the first instance, conduct an individualized analysis of whether each defendant is entitled to qualified immunity. In doing so, the district court may choose to conduct the analysis on the basis of the record as it currently exists, or it may allow the parties to supplement their summary-judgment submissions in light of our opinion today.

## IV.

Finally, though we do not opine on whether either Defendant is entitled to qualified immunity, we agree with the district court's determination that the right at issue here arises under the Fourth Amendment, not the Fourteenth Amendment, as Defendants assert.

In any § 1983 case, we must begin our analysis by identifying "the precise constitutional violation" the defendant has allegedly committed. *Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013) (per curiam). This step requires us, viewing the facts in the light most favorable to Alcocer, to establish the cause of her continued detention after posting bond. Here, the district court noted that Alcocer obtained a bond for her misdemeanor suspended-license offense and would have been released on January 30, immediately upon securing her bond, had

14

it not been for the alleged ICE detainer. Viewing the facts in the light most favorable to Alcocer, the district court concluded that Alcocer remained incarcerated because Defendants engaged in a second detention of her for being an illegally present alien.

This fact pattern potentially presents two possible rights as candidates for driving our analysis: (1) the Fourth Amendment right to be free from unreasonable seizures, *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009), and (2) the Fourteenth Amendment due-process right to be free from continued detention after law enforcement should have known that the detained person was entitled to release, *West v. Tillman*, 496 F.3d 1321, 1327 (11th Cir. 2007) (per curiam).

The Fourth Amendment, in relevant part, guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. Detention, of course, is a type of seizure of the person to which Fourth Amendment protections attach. *See United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003). If a detention exceeds the bounds of a *Terry*[7] stop, which is a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30), law enforcement must have probable cause to support that seizure of the person. *See United States v. Place*, 462 U.S. 696, 702

---

[7] *Terry v. Ohio*, 392 U.S. 1 (1968).

(1983).  Along these same lines, the Supreme Court long ago held that, beyond a *Terry* stop, any detention of a suspected alien "must be based on consent or probable cause" that the person is, in fact, an alien.  *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975).

Here, viewed in the light most favorable to Alcocer, the facts reflect that she continued to be detained after satisfying the bond requirements, solely because of suspicion that she might be illegally present in the United States.  This overnight detention plainly was not "brief," so it could not have been a *Terry* stop.  Nor did Alcocer consent to her overnight detention.  Indeed, she protested it.  So if the Fourth Amendment governs the analysis here, to the extent that Defendants were causally involved in Alcocer's overnight detention, they must show they had probable cause (or in the qualified-immunity analysis, arguable probable cause) to believe that Alcocer was illegally present in the United States.

We turn now to the Fourteenth Amendment.  That amendment applies when an individual alleges an "over-detention," or a continued detention after a right to release, where probable cause supported the charge for which the person was detained.  *See*, *e.g.*, *West*, 496 F.3d at 1327.  When an over-detention occurs and the Fourteenth Amendment governs the analysis, a plaintiff must demonstrate that the defendant acted with deliberate indifference to her due-process rights.  *Id.* at 1327.  That requires her to show three things:  (1) the defendant had subjective

16

knowledge of a risk of serious harm, consisting of continued detention when the plaintiff was entitled to be released; (2) he disregarded that risk; and (3) he did so by conduct that is more than mere negligence.  *See id.* (citation omitted).

As we have noted, we have applied the Fourteenth Amendment analysis in cases involving over-detentions.  In *Case*, 555 F.3d 1317, for example, the plaintiff was arrested based on probable cause that he had violated the law.  *See id.* at 1324-27.  But he was not released from jail until roughly seven hours after he satisfied his bond.  There, plaintiff's over-detention appears to have been caused solely by some type of deficiency in the administration of the jail.  *See id.* at 1324, 1327, 1329-30.  There was no allegation that the plaintiff continued to be detained because of suspicion he had committed an independent violation for which independent probable cause was required.

Similarly, in *West*, 496 F.3d 1321, following the plaintiff's arrest on probable cause that he had violated the law, the plaintiff posted bond but nonetheless remained in custody for an additional 23 days.  *See id.* at 1325-26.  That occurred purely as a result of deficiencies in the defendants' administration of the bond-notification procedure.  As in *Case*, there was no allegation that the plaintiff was detained after posting bond because of suspicion that he had committed an independent violation for which independent probable cause was required.

And in *Cannon v. Macon County*, 1 F.3d 1558 (11th Cir. 1993), *opinion modified on reh'g on other grounds*, 15 F.3d 1022 (11th Cir. 1994), the plaintiff was arrested based on probable cause that she had committed a theft. *Id.* at 1560. There, the arresting officer ran the plaintiff's name through the National Crime Information Center database and received information that the plaintiff was wanted in another state.[8] *Id.* As it turned out, though, another person with the same first and last names actually committed the theft. *Id.* at 1560-61. The plaintiff was misidentified as the offending person and was therefore mistakenly detained. *Id.* So while it was surely no comfort to the plaintiff in *Cannon*, she was not detained without probable cause that a violation had been committed by someone with her first and last names.

In all of these cases, we held that the right at issue was the Fourteenth Amendment due-process right to be free from continued detention after law enforcement should have known that the detained person was entitled to release. *See id.*; *see also Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009) (per curiam). That right, we said, is protected by the Fourteenth Amendment's guarantee of substantive due process. *See Cannon*, 1 F.3d at 1563.

---

[8] Although in *Cannon* we did not expressly determine whether the officers initially had probable cause, this Court has found that an arrestee's name matching a warrant database establishes probable cause. *See Rodriguez v. Farrell*, 280 F.3d 1341, 1345-46 (11th Cir. 2002) (finding a valid arrest in similar circumstances); *United States v. Roper*, 702 F.2d 984, 989 (11th Cir. 1983) ("NCIC printouts are reliable enough to form the basis of the reasonable belief which is needed to establish probable cause.") (quotation and citation omitted).

18

After careful consideration of these cases, we conclude that the precise right implicated by the facts Alcocer alleges is the Fourth Amendment right to be free from unreasonable seizures.  That is so for two reasons.

First, the facts here require this conclusion.  In explaining why, we look at the reason for Alcocer's continued detention after she satisfied her bond requirements.  Viewing facts in the light most favorable to Alcocer, she remained in jail solely because of suspicion that she was in the United States illegally.  The Sheriff's Office staff told Alcocer's sister that she was not being released due to an ICE hold; statements in Alcocer's file, mentioning Defendant Staten, show that her continued detainment was related to an ICE hold; and Alcocer was released almost immediately after an ICE agent notified the Sheriff's Office that Alcocer was in fact a citizen.

Any facts that might have underpinned the conclusion that Alcocer was in the United States illegally were not a part of the probable cause that supported Alcocer's original detention, which was for the misdemeanor of driving with a suspended license.  For this reason, independent probable cause was required to warrant Alcocer's continued detention after she had satisfied all conditions of her bond on her original detention.  *See*, *e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015) (holding that where plaintiff was not released from custody after being ordered released on her personal recognizance for criminal charges of

19

having made misrepresentations in an application for state benefits, "she was subjected to a new seizure for Fourth Amendment purposes [when she was immediately rebooked on suspicion of being illegally in the United States]—one that must be supported by a new probable cause justification.").

Second, the law similarly demands this result. The Fourth Amendment provides an explicit source of protection for the right that Defendants allegedly violated. The Fourteenth Amendment does not. Rather, as we have noted, the Fourteenth Amendment right to be free from continued detention after law enforcement should have known that the person was entitled to release is a substantive-due-process right. *See Cannon*, 1 F.3d at 1563. Where the Constitution "provides an explicit textual source of constitutional protection" for the violation alleged, we apply the analysis that constitutional provision requires, rather than the analysis dictated by "the more generalized notion of 'substantive due process.'" *Graham v. Connor*, 490 U.S. 386, 395 (1989). Because the Fourth Amendment provides "an explicit textual source for constitutional protection" under the factual scenario here, it governs.

For these reasons, we hold that the district court correctly determined that this case involves the Fourth Amendment right to be free from unreasonable seizures.

## IV.

We reverse the district court's denial of summary judgment for Defendants and remand for the district court to conduct an individualized assessment of each Defendant's actions to determine whether either or both Defendants are entitled to qualified immunity. We affirm the district court's determination that this case implicates the Fourth Amendment right to be free from unreasonable seizures.

**REVERSED AND REMANDED.**