[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10049
Non-Argument Calendar

_____

D.C. Docket No. 5:18-cv-00178-TKW-MJF

FALLON CHRISTINA PAULK,

Plaintiff - Appellant,

versus

TOMMY FORD,
Sheriff Bay County Florida,
RICK ANGLIN,
JEROLD DERKAZ,
MD,
DAVID SASSER,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(September 4, 2020)

Before ROSENBAUM, GRANT, and LUCK, Circuit Judges.

PER CURIAM:

Fallon Paulk nearly died due to complications of Crohn's disease while in pretrial detention at the Bay County Jail (the "jail"). After undergoing life-saving emergency surgery upon her release, she filed this lawsuit alleging that Defendants-Appellees—Tommy Ford, the Bay County Sheriff; Rick Anglin, the jail's warden; Dr. Jerold Derkaz, the jail's Chief Medical Officer and Paulk's primary doctor at the jail; and David Sasser, the jail's Health Services Administrator—were deliberately indifferent to her serious medical needs, in violation of her constitutional rights. The district court granted summary judgment to the defendants, concluding that they did not act with deliberate indifference. Because genuine issues of material fact remain in the record, we vacate and remand for further proceedings.

## I.

In January 2014, Paulk was arrested for drug possession and booked into the Bay County Jail, where she remained until her release on July 7, 2014. Immediately after her release, Paulk was rushed to the emergency room and underwent surgery. According to the surgeon, Paulk had been septic and malnourished for seven days and was "lucky to be alive." Had she stayed in jail any longer, the surgeon told her, she would have been dead.

2

Paulk's near-death experience stemmed from complications of Crohn's disease, a chronic inflammatory bowel disease that affects the lining of the gastrointestinal tract.  Symptoms of Crohn's disease include abdominal pain and cramping, diarrhea, fatigue, weight loss, and malnutrition.  Crohn's disease is characterized by active symptomatic periods—sometimes called "flare-ups"—and periods of remission.  Flare-ups can also lead to more serious complications like bowel obstructions or perforations, which require immediate medical attention and potentially surgery.  Because there is no cure for Crohn's disease, treatment is focused largely on reducing the inflammation that causes flare-ups and relieving the symptoms that arise.  To those ends, a variety of medications may be prescribed, including steroids, immunosuppressants, and antibiotics.[1]

During her approximately six-month stay at the jail, Paulk experienced multiple flare-ups of Crohn's disease and submitted numerous written requests for medical treatment.  With some fluctuation, her symptoms increased in severity over the course of her pretrial detention.  The jail knew that Paulk suffered from Crohn's disease from the outset because during intake at the jail she disclosed it and a prior bowel resection surgery.

---

[1] *See Crohn's disease – Diagnosis and treatment,* MAYO CLINIC, https://www.mayoclinic. org/diseases-conditions/crohns-disease/diagnosis-treatment/drc-20353309 (last visited Aug. 13, 2020).

Paulk began experiencing intermittent Crohn's symptoms in mid-March, starting with abdominal pain. In April, she twice requested a low bunk due to pain and inflammation, but these requests were denied. In late April, she reported vomiting and severe abdominal cramping for three days. She was seen on May 2 by Waneda Wolfe, an advanced registered nurse practitioner ("ARNP"), who prescribed medications to treat her cramps, nausea, and vomiting.

From May through June 16, Paulk submitted numerous sick-call requests complaining of abdominal cramping of increasing severity, an inability to use the restroom, and heartburn. In response to these requests, ARNP Wolfe and Dr. Derkaz examined Paulk on multiple occasions, prescribed a variety of medications to treat her symptoms, ordered X-rays to be taken on May 29, June 2, and June 10; and collected blood samples for tests on June 10. The X-rays on May 29 and June 2 found "no evidence for obstruction," but the X-ray from June 10 noted "[f]indings consistent with an intermittent or partial small bowel obstruction."

On June 16, Wolfe ordered Paulk sent to the emergency room. According to Wolfe, Paulk appeared "ill, pale & in pain" and her abdomen was distended and tender. Paulk was admitted to the hospital and underwent a CT scan, x-rays, a colonoscopy, and other tests. The CT report noted mild constipation and findings that were consistent with Crohn's disease and a "possible early or partial small bowel obstruction." The X-ray report noted a possible "inflammatory distal small bowel

4

stricture"—a narrowing of the intestine—but "[n]o signs of bowel perforation or other acute process." Finally, Dr. Finlaw performed a colonoscopy with biopsy, finding an "ileocolonic anastomosis" stricture that the scope could not pass through. In a post-operative report, Dr. Finlaw wrote that Paulk should "[c]ontinue steroids" and that she "will need Remicade, although this may be challenging in the fact that she is currently incarcerated." Dr. Finlaw also ordered a high-fiber diet.

The hospital discharged Paulk on June 20 in stable condition with a diagnosis of a small-bowel obstruction with a fair prognosis. The discharge summary noted that surgery had signed off and that Paulk was "not having any acute abdomen." The summary further noted that Paulk "plans to start Remicade in the outpatient" and that she should return to the hospital for a follow-up appointment in one to two weeks. Despite these discharge instructions, however, Paulk did not return to the hospital for a follow-up appointment, nor was she prescribed Remicade. The jail continued her treatment with steroids and other medications that she had previously received at the jail.

Meanwhile, Paulk's parents became increasingly worried about her health. After her hospitalization from June 16–20, Paulk's father called Sasser, the jail's Health Services Administrator, every day, speaking with him regularly. For her part, Paulk's mother called the jail up to five times a day. At some point after Paulk's discharge, Paulk's mother spoke with Sasser and informed him that Paulk had

5

previously been on Remicade when Paulk had her prior bowel surgery, and that she (Paulk's mother) did not think it would be a good idea for Paulk to start taking it again.

After her discharge from the hospital, Paulk was returned to the jail's regular housing. Over the next two days, Paulk requested a refill for Doxepin—used to treat depression, anxiety, and insomnia—and indicated that she was having trouble sleeping. On June 23, Paulk also reported that her abdomen was hurting again. Dr. Derkaz examined Paulk on June 24 and noted that she had been up the night before with some abdominal pain, nausea, and vomiting. That same day, Dr. Derkaz canceled the high-fiber diet ordered by Dr. Finlaw.

Dr. Derkaz saw Paulk again on June 30, two days after Paulk was moved to the medical unit for observation. Paulk had been running a fever on June 28, and Paulk's family members had called the jail to say that other inmates were calling them and stating how sick Paulk was. In his treatment notes for June 30, Dr. Derkaz wrote that Paulk seemed to be doing much better and that she had no guarding or distension. Paulk was returned to general population after seeing Dr. Derkaz.

On July 1, Paulk asked for "some [B]oost" and inquired whether she could get "a full liquid diet," writing that she was "getting weak because I can't eat" and had lost significant weight. A nurse disputed Paulk's claim of weight loss and denied the request for Boost. Paulk responded, claiming that she had dropped from 155 to

6

138 pounds.  On July 2, Paulk requested a higher dose of Doxepin and to see the doctor.

On July 3, Dr. Derkaz examined Paulk and determined that she had a partial small-bowel obstruction that was stable and not a "surgical problem" at that time.  It was not a surgical problem, according to Dr. Derkaz, because "[a] physical examination showed her abdomen to be soft and with active bowel signs, left-sided tenderness, no guarding or distension."  Dr. Derkaz's treatment notes indicated that Paulk had a bowel movement that morning and had vomited once or twice.  Paulk was given Boost.  This was the last time Dr. Derkaz examined Paulk.

At around 10:00 a.m. on July 4, according to treatment notes, Paulk, in tears, presented to medical with stomach pain, nausea, vomiting, and diarrhea.  She could not walk or sit up straight.  She was given Toradol, an anti-inflammatory pain reliever.  Later that night, just after 10:00 p.m., Paulk reported abdominal pain, nausea, and feeling faint.  A nurse noted that Paulk's abdomen was distended and firm with hypoactive bowel sounds and that she had difficulty walking and sitting upright.  Paulk was given prescribed medications, but the nursing staff was unable to reach Dr. Derkaz or to leave a voicemail.  Paulk was reassessed approximately 40 minutes later and reported that she was feeling better.

At around 11:25 a.m. the following day, July 5, Paulk again reported abdominal pain, nausea, vomiting.  Her abdomen was distended and firm, and she

was unable to stand or sit upright.  The nursing staff contacted Dr. Derkaz, who prescribed Toradol for pain relief and Phenergan for nausea and vomiting but took no other action.  At that time, according to Dr. Derkaz, he "probably" knew that Paulk was going to be released soon.

The treatment notes indicate that a nurse checked on Paulk at approximately 1:30 p.m. and wrote that she was resting quietly with no apparent symptoms of distress.  The same nurse checked on Paulk at 4:05 p.m. that same day and twice the next day, July 6, each time noting that Paulk was resting and exhibited no apparent symptoms of distress.  Her abdomen remained distended and firm, however.

Although the treatment notes indicate that Paulk was being closely monitored from July 3–6, Paulk testified that the nurses "weren't coming to take care of me" and that she preferred being in general population because at least there she "had people helping take care of me."  She elaborated,

> They weren't even wanting to bring my medication inside the medical cell.  They were wanting me to come to the door just to get my medication, and I couldn't even get up. . . . I remember being very, very sick and throwing up and couldn't even make it to the toilet.  And I was puking all over the cell and they were just letting it stay in there.

By early July, Paulk's parents feared for her life.  Based on information from Sasser, Paulk, and other inmates, her parents were convinced that Paulk had a bowel blockage and that she was "going septic."  Paulk's mother kept in touch with an

8

inmate housed with Paulk who was "trying to keep [Paulk] alive basically."[2]  But despite their best efforts, the jail refused to take action.  In his phone calls to Sasser, Paulk's father tried to explain that Paulk was likely going septic due to Crohn's disease, that "[h]er body is swelling up and if it's not treated, she's going to be septic."  Paulk's mother testified that she conveyed similar information to jail staff, though at some point they stopped answering her calls, likely recognizing her number.

Two or three days before the court hearing on July 7, Paulk's mother sent her father to the jail because Paulk was "in really bad shape.  She's got to get to the hospital or she's going to die."  Paulk's father went to the jail with his sister and tried to persuade jail staff to call an ambulance, but they refused.  Paulk's father responded, "well let me call an ambulance, and they said, no."  He then implored, "listen, you people don't understand what's going on. . . . She is going to die."  But jail staff refused to call an ambulance or provide any information about Paulk.

Paulk was released from jail on July 7, after her court date.  Paulk testified that she was "so sick that [she] was in a wheelchair" and was largely "unresponsive."

---

[2] The record contains what appears to be a letter from this inmate to Paulk's parents.  This letter provides details about events relating to Paulk at the jail from late June through Paulk's release.  The letter is unsworn, however, and Paulk has not indicated that this inmate is available to testify.  Because the letter itself appears to be inadmissible hearsay, and because it is unclear at this time whether the inmate would be available to provide testimony in this case, we do not consider the letter in evaluating whether the district court correctly granted summary judgment.

Her parents rushed her to the emergency room, where a CT scan showed findings of bowel perforation, air, and abscesses. She underwent emergency surgery and had multiple abdominal abscesses drained and small bowel strictures that were resected. Before she was discharged, the surgeon told her that she had "gone septic" and was "lucky to be alive." The surgeon stated that upon her admission she had "only a 25 percent chance to live" and that she would have died if she stayed in jail any longer. The surgeon informed Paulk's mother that Paulk had been septic for seven days and that her blood work indicated that she had been without food and water during that time. That suggests Paulk had been septic and without food or water since June 30 or July 1.

## II.

Paulk filed this lawsuit under 42 U.S.C. § 1983 alleging that the defendants were deliberately indifferent to her serious medical needs, in violation of her constitutional rights. Paulk also alleged state-law claims of negligence against Sheriff Ford. After discovery, the defendants filed a motion for summary judgment, which the district court granted. With regard to the federal claims, the court concluded that the defendants were not deliberately indifferent to Paulk's serious medical needs because the jail's medical staff provided frequent medical care to address her condition, and because negligence in treatment or even medical malpractice is not enough to give rise to a constitutional claim. The court declined

to exercise supplemental jurisdiction over the state-law claims and remanded them to state court.  Paulk now appeals the dismissal of her § 1983 claims.

## III.

"We review a district court's grant of summary judgment *de novo* considering all the facts and reasonable inferences in the light most favorable to the non-moving party." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009).  Summary judgment is appropriate if, based on the evidentiary materials in the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks omitted).

## IV.

Because Paulk was a pretrial detainee at the time of the alleged violations, her claims are governed by the Due Process Clause of the Fourteenth Amendment. *Jackson v. West*, 787 F.3d 1345, 1352 (11th Cir. 2015).  Nevertheless, the minimum standard allowed by the Due Process Clause for pretrial detainees is the same as that allowed by the Eighth Amendment for prisoners. *Id.*

Under the Fourteenth Amendment, pretrial detainees like Paulk have the "right to receive medical treatment for illness and injuries." *Cook ex rel. Estate of*

11

*Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005).  A pretrial detainee can establish a violation of this right by showing that a jail official displayed "deliberate indifference" to her serious medical needs.  *Id.*; *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

A deliberate-indifference claim has both an objective component and a subjective component.  *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).  For the objective component, the plaintiff must show that she has an objectively "serious medical need"—that is, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Id.* (quotation marks omitted).

Appellees do not dispute that Crohn's disease and its complications present objectively serious medical needs.  The evidence shows that Paulk's Crohn's disease led to complications that twice required her hospitalization and nearly resulted in her death.  This is sufficient to show that Paulk had serious medical needs.

For the subjective component, the plaintiff must "show the [jail] official's: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence."  *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotation marks omitted); *see Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (explaining that the standard of deliberate indifference is consistent with recklessness in the criminal law).  "Conduct that is more than mere

12

negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." *Bingham*, 654 F.3d at 1176.  Additionally, an officer "who delays necessary treatment for non-medical reasons may exhibit deliberate indifference." *Id.*; *Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003).

However, "[m]ere incidents of negligence or malpractice do not rise to the level of constitutional violations." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).  Deliberate indifference is about "obduracy and wantonness, not inadvertence or error in good faith." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "It is the equivalent of recklessly disregarding a substantial risk of serious harm to the inmate." *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (quotation marks omitted).  So "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." *Harris*, 941 F.2d at 1505.

Here, no reasonable jury could conclude that the defendants were deliberately indifferent to Paulk's serious medical needs before her hospitalization from June 16–20.[3]  Before that time, Paulk regularly received medical attention and treatment for symptoms of Crohn's disease, in most instances within one or two days after she

---

[3] Notably, Paulk did not sue ARNP Wolfe, who treated Paulk during this time, for deliberate indifference.

13

requested medical assistance.  She was prescribed various medications to treat her symptoms, she underwent diagnostic procedures such as X-rays to determine the severity of her condition, and she was taken to the hospital shortly after the jail discovered that she may have a bowel obstruction.  Whether this care was good or negligent, it simply does not reflect the type of "reckless[] disregard[]" of inmate health that we have found sufficient to meet the standard of deliberate indifference.[4] *Cottrell*, 85 F.3d at 1491; *see Bingham*, 654 F.3d at 1176; *Harris*, 941 F.2d at 1505.

But as to the events following her hospital discharge and her return to the jail, we conclude that there are genuine issues of material fact that preclude summary judgment.  Before explaining why, we pause a moment to clarify what is at issue on appeal.  In granting summary judgment, the court found that Paulk failed to present sufficient evidence of deliberate indifference.  But the court did not go further and address the defendants individually or their claims of qualified immunity.  The parties on appeal likewise do not address qualified immunity or the claims as to

---

[4] Paulk asserts that laxatives were "contraindicated" for her conditions but were prescribed, anyway.  But she offers no medical or expert evidence as to the use of laxatives to treat Crohn's disease.  The only supporting testimony she offers came from her mother, who believed that it was "in total disregard for Crohn's patients to ever take a laxative" and stated that she had been "[t]old by a gastro doctor to never take a laxative or anything like that because it only aggravated the Crohn's symptoms."  On the other hand, both Dr. Derkaz and ARNP Wolfe testified that laxatives are sometimes prescribed for Crohn's patients.  On this record, we cannot say that Paulk's evidence on this point reflects anything more than"a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment," which is not sufficient to "support a claim of cruel and unusual punishment."  *Harris*, 941 F.2d at 1505.

14

particular defendants.  Because these inquiries require individualized assessments,[5] the sole issue before us, as we see it, is simply whether a reasonable jury could find in Paulk's favor on any of her claims of deliberate indifference, and not the viability of all her claims or whether qualified immunity applies.  With that clarification, we explain why Paulk could prevail on a deliberate-indifference claim at least as to Dr. Derkaz.

The evidence reflects that Paulk returned to the jail from the hospital with a diagnosis of a partial small-bowel obstruction and recommendations (in the jail's view) or orders (in Paulk's view) to give her Remicade and a high-fiber diet and to return her to the hospital for a follow-up appointment within two weeks.  Although her condition did not require surgery at that time, Dr. Derkaz knew it required monitoring going forward and that life-threatening complications could result.  Dr. Derkaz testified that complications common to Crohn's disease can lead to life-threatening conditions, such as a complete bowel obstruction or a bowel perforation.

---

[5] *See Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018) ("Because § 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation, each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions."); *Dang ex rel. Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (stating that, when assessing the subjective component of a claim of deliberate indifference, we must judge each individual defendant "separately and on the basis of what that person kn[ew]" and not on "[i]mputed or collective knowledge").

15

Life-threatening conditions did in fact result.  By July 7, Paulk was largely "unresponsive" and close to death.  According to the surgeon who performed emergency life-saving surgery after her release from the jail, Paulk was "lucky to be alive" and had been septic and malnourished for seven days.

And there is sufficient evidence for a jury to conclude that Dr. Derkaz was aware that Paulk was deteriorating and developing life-threatening conditions due to her Crohn's disease but took no reasonable action in response.  *See McElligott v. Foley*, 182 F.3d 1248, 1259 (11th Cir. 1999) (finding sufficient evidence of deliberate indifference where "the defendant was aware that plaintiff's condition was, in fact, deteriorating, and still did nothing to treat this deteriorating state."); *Carswell v. Bay Cty.*, 854 F.2d 454, 457 (11th Cir. 1988) (finding sufficient evidence of deliberate indifference whether the defendants were aware of the plaintiff's deteriorating condition but did little to ensure that the plaintiff received medical attention).

On July 1, Paulk reported that she was "getting weak because I can't eat." Two days later, she saw Dr. Derkaz, who believed that she did not have a "surgical problem" at that time because her abdomen was "soft and with active bowel signs, left-sided tenderness, no guarding or distension."  But the very next day Paulk reported to medical in tears and complained of abdominal pain, nausea, and vomiting.  And that day and the next, July 4 and 5, nurses noted that Paulk's

16

abdomen was distended and firm, that she had difficulty walking and sitting upright, and that she had hypoactive bowel sounds.  Although the nursing staff was unable to reach him on July 4, Dr. Derkaz was informed of Paulk's condition on July 5.[6]

Dr. Derkaz's own testimony reflects that the symptoms reported by Paulk and the nurses indicated that her condition was deteriorating and required emergency care.  In attempting to downplay the severity of Paulk's condition, he testified that "if she had a full bowel obstruction she would have been vomiting and would be getting sicker," "she wouldn't be able to eat," and she "would be getting progressively worse and worse and worse."  But a reasonable jury could conclude that Paulk did exhibit these symptoms, or symptoms of comparable severity, and that Dr. Derkaz knew as much.  As of July 5, when Dr. Derkaz was informed of Paulk's condition, Paulk had been in severe distress for at least two days, with nausea, vomiting, abdominal pain, a distended and firm abdomen, hypoactive bowel sounds, an inability to eat, and difficulty walking or standing upright.  Under Dr. Derkaz's own testimony, these symptoms reflect a potential life-threatening condition requiring surgery.

Despite his awareness of these facts, Dr. Derkaz took no action with regard to Paulk's medical needs, apart from prescribing Toradol, for pain relief, and

---

[6] Meanwhile, Paulk's parents repeatedly called Sasser and other jail staff and described Paulk's condition, pleading that she likely had a bowel obstruction, was going septic, and needed emergency medical care or else she would die.

17

Phenergan, for nausea and vomiting, the same medication she had previously received at various times at the jail. He did not order X-rays or blood tests, as the jail previously had done when she experienced similar but less severe symptoms in May and June. He did not personally examine Paulk after July 3. Nor did he call a specialist or an ambulance or direct anyone else to do those things. And Paulk almost died as a result.

A reasonable jury could conclude from this evidence, viewed in the light most favorable to Paulk, that Dr. Derkaz "recklessly disregard[ed] a substantial risk of serious harm to the inmate." *See Cottrell*, 85 F.3d at 1491. A jury could reasonably conclude that in early July 2014 Paulk's need for emergency care was obvious and that Dr. Derkaz's response—prescribing medication for her symptoms that did little or nothing to ameliorate a potential life-threatening complication like a bowel obstruction or perforation—was "grossly inadequate" or was "so cursory as to amount to no treatment at all." *See McElligott*, 182 F.3d at 1255–57 (reasoning that "a jury could find that the medication provided to [the plaintiff] was so cursory as to amount to no care at all" because it "was not treating the severe pain he was experiencing"). "A jury could infer deliberate indifference from the fact that [Dr. Derkaz] knew the extent of [Paulk's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [her] condition." *Id.* at 1257–58 (quotation marks omitted). In other words, this case is

18

not about a simple difference in views on appropriate treatment, which is insufficient to show deliberate indifference. *See Harris*, 941 F.2d at 1505. Rather, a jury could reasonably conclude "that the defendant was aware that plaintiff's condition was, in fact, deteriorating, and still did nothing to treat this deteriorating state." *McElligot*, 182 F.3d at 1259.

We acknowledge that Paulk received medical care throughout her incarceration at the jail. And courts "hesitate" to find a constitutional violation where an inmate has received medical care. *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989). "Hesitation does not mean, however, that the course of a physician's treatment of a prison inmate's medical or psychiatric problems can never manifest the physician's deliberate indifference to the inmate's medical needs." *Id.* And it remains the case that "grossly incompetent medical care or choice of an easier but less efficacious treatment can constitute deliberate indifference." *Id.* For the reasons explained above, we conclude that there is sufficient evidence for a reasonable jury to return a verdict against Dr. Derkaz on Paulk's claim of deliberate indifference.

Accordingly, the district court erred in granting summary judgment on the ground that Paulk had not offered sufficient evidence of deliberate indifference as to any of the defendants. We conclude that, at least as to Dr. Derkaz, summary judgment was not appropriate because a reasonable jury could return a verdict in

19

Paulk's favor on her claim of deliberate indifference. *See Guevara*, 920 F.3d at 720. But because the court (and the parties on appeal) did not go further and conduct an individualized assessment of the evidence as to each defendant or address the defendants' claims of qualified immunity, we do not do so in the first instance.

Instead, we believe that the most prudent course of action is simply to vacate the grant of summary judgment and remand for further proceedings. For the issues that remain, the district court may choose to conduct the analysis on the basis of the record as it currently exists, or it may allow the parties to supplement their summary-judgment submissions in light of our opinion today.

**VACATED AND REMANDED.**